STATE EX REL. UEBELHOR ET AL. *v.* ARMSTRONG ET AL.

[No. 1268S199. Filed June 10, 1969. Rehearing denied August 25, 1969.]

*Henry C. Ryder, D. Reed Scism,* Indianapolis, *Roberts & Ryder,* of counsel, Indianapolis, for appellants.

*Willard C. Shrode, Wilbur C. Clippinger, Shrode & Clippinger,* Evansville, *Jack C. Brown, William E. Jenner,* Indianapolis, *Jenner & Brown,* of Counsel, Indianapolis, for appellees.

ARTERBURN, J.—This action was instigated by appellants' proceeding in quo warranto, which asked that they be invested with the directorship and management of the Bank of Ireland pursuant to an election held January 6, 1967. The appellants were the principal stockholders of the Dubois County Bank. Both banks were located and doing business in the same county. The appellees, defendant below, claimed to have been elected at the same election as directors and refused to turn over the management and books of the Bank of Ireland because they contended that appellants' action in acquiring stock in the Bank of Ireland violated the Indiana Bank Holding Company Act [Acts 1957, ch. 165, § 1, p. 340, being Burns' Indiana Stat. Ann., §§ 18-1814—18-1817].

The facts were largely stipulated. At the time of the election in question and for some time prior thereto the Dubois County Bank had 45,000 shares of common capital stock issued and outstanding, of which the appellants and wives and minor children held 8,098 shares. Employees of the bank held an additional 962 shares.

The evidence further shows that a management proxy committee consisting of four of the appellants and a bank director who was not an appellant, voted between 16,500 and 19,700 shares at the annual election of the Dubois County Bank for each year from 1963 to 1967. This committee as a group voted the proxies solicited by the management in accordance with the terms on the printed proxy form. The proxies were voted by the committee as a whole and not by any individual members of the committee.

About November 15, 1965, appellant Uebelhor purchased 1,000 shares of the Bank of Ireland. He then talked to other appellants about each taking 200 shares. This they did. On

December 1, 1965, shortly after this purchase, Uebelhor and the cashier of the Dubois County Bank met with the directors of the Bank of Ireland and suggested a merger between the banks. This was rejected by the officials of the Bank of Ireland. Uebelhor next purchased 1004 shares of the Bank of Ireland in February, 1966. Uebelhor and other relators, with the occasional help of employees of the Dubois County Bank, solicited sales of the stock of the Bank of Ireland from various individuals. The purchase of the stock was financed by a series of loans to appellant Braun. The loans were made from an Indianapolis bank and were guaranteed by the appellants. These various purchases of the Bank of Ireland stock were divided from time to time among the appellants. Appellant Uebelhor made these arrangements and admitted in the trial court that his actions could be construed as making him a "front" for the group.

December 7, 1966, was the date fixed for stockholders of record who would be eligible to vote at the succeeding annual meeting in January. At that time the appellants were the record owners of a total of 2,632 shares of the outstanding 7,500 shares of stock of the Bank of Ireland. In addition, the appellants held proxies for an additional 1,310 shares.

At the election of January 6, 1967, appellees refused to recognize the appellants voting for the 2,632 shares held in their name, or the 1,260 shares for which appellants held endorsed certificates of transfer, or the 1,310 shares for which appellants held proxies. Minutes of the meeting were kept by both contesting groups. The minutes of the meeting kept by appellees do not recognize any shares owned by appellants as being present and therefore show only the 3,309 shares as in attendance. The appellees' minutes show appellants' shares as disqualified and show all 3,309 shares voted for appellees as directors. On the other hand, the minutes of the shareholders meeting kept by the appellants show that each appellant was nominated for a director of the Bank of Ireland and that the 3,942 shares were voted in their favor.

Each respective board of directors then elected their own separate slate of officers. Following the election appellants demanded that appellees surrender the directorships and offices which they hold. This demand was refused. Appellees continue to act as officers and directors.

The appellants have filed this action of quo warranto. In answer thereto the appellees contend that the appellants have violated the Indiana Bank Holding Company Act and have attempted to take over another bank, in violation of the provisions of the Indiana Bank Holding Company Act, and ask in equity that the appellants be enjoined and restrained from securing or maintaining such control and be divested of the ownership of the shares which result in their control of the Bank of Ireland.

The trial court, in a special finding of fact and conclusions of law, found that the appellants, pursuant to an agreement among themselves, acted in a joint venture or enterprise to purchase the shares of the Bank of Ireland stock, and that appellant Uebelhor acted as a leader and organizer of such joint venture. The trial court found appellants' actions constituted a violation of the Indiana Bank Holding Company Act (Burns' §§ 18-1814—18-1817), and entered judgment for the appellees and ordered appellants to divest themselves of the stock held in the Bank of Ireland through a public sale by means of a Commissioner appointed by the court. The judgment also provided that appellants pay attorney fees incurred by the appellees.

The judgment was later modified to include a provision that 2,068 shares should not be sold for less than the average rate of $35.00 per share, which was considered the original cost to the appellants of those shares. From this judgment the appellants make their appeal.

Appellants argue that they do not fall within the terminology of the Indiana Bank Holding Company Act (Burns'

§§ 18-1814—18-1817). This Act in general provides that one bank or trust company may not acquire control by acquisition of stock of another bank and trust company without first securing a permit from the Department of Financial Institutions and a showing that such acquisition is in the public interest and the interest of the stockholders, depositors, creditors, etc. of the institutions involved. the Act [Burns' § 18-1815(b)] further provides that it applies to any of the following groups which might attempt such purchase or merger:

". . . corporation, partnership, joint-stock company, business trust, voting trust, joint venture, association or similar organization, domestic or foreign, which is doing business in Indiana, . . ."

with certain exceptions not applicable here. The Act prohibits, among other things, any such group which "directly or indirectly owns" 25% or more of the voting shares of each of the two banks involved.

The appellants contend that the finding by the trial court that their group constituted a joint venture is erroneous. The evidence presented in the trial court, however, shows that all seven of the appellants acted as a group to acquire the money necessary to make the purchases of stock. All of them jointly obligated themselves to a $160,000.00 loan for that purpose. The stock acquired by appellant Uebelhor was divided among the group. Earl M. Salb, one of the appellants, admitted that the appellants acted together as a group at various meetings to decide how to divide the stock, and various matters concerning the stock. William M. Braun, an appellant, acted as treasurer of the group. Mr. Salb, an appellant, testified that the appellants undertook a plan to buy the stock of the Bank of Ireland in expectation of a profit:

"Q. How did you determine on that division? All seven of you agree among yourselves as to who would take how many shares?

"A. I imagine.

"Q. Well did you, you did didn't you? As a matter of fact, you had to didn't you?

"A. Well yes.

"Q. Well let me ask you this, if you wanted, your group, wanted, of Relators, wanted to make the Bank of Ireland a branch bank of the DuBois County Bank didn't you figure it would be a good deal for the DuBois County Bank?

"A. I thought it'd be . . . I thought it would be good for the stockholders of the DuBois County State Bank.

"Q. And you're a stockholder of the DuBois County—

"A. Yes.

"Q. Bank. So you thought it would be profitable for them. Indirectly then that was your profit motive, is that correct? That you would benefit really as a stockholder of DuBois County Bank rather than as a stockholder of Bank of reland.

"A. Yes."

Appellant Uebelhor testified that his actions could be construed as making him a "front" for the group and that appellant Braun had the authority to sign the checks given with reference to the stock purchased:

"Q. Well, the checks that were given to the Bank of Ireland came from a special account?

"A. Mr.—Mr. Braun signed the checks, sure.

"Q. All right.

"A. Personally.

"Q. He had authority from the rest of you to do this?

"A. He has an individual checking account, yeah, to pay these.

"Q. Did he have authority to disburse this money?

"A. Sure, to pay for these expenses.

"Q. Did anyone else in the group—

"A. What?

"Q. —have and were they signatory on this account?

"A. No. No.

"Q. Well, then was he your Treasurer for this money?

"A. He paid the bills. I don't know whether you're goin call it Treasurer or not I—I just—

"Q. He paid the bills regardless—

"A. Yeah. Yeah

"Q. —of what you want to call it.

"A. That's right."

A summary of the evidence most favorable to the appellee and in support of the trial court's finding shows that the appellants were acting in concert and as a group; that they bought the shares of the Bank of Ireland and divided the stock among themselves and authorized one of the appellants to pay the bills. The plan had a profit motive and in fact was for the purpose of gaining control of the Bank of Ireland. In our opinion, this constitutes a joint venture, to say the least.

"Arrangements for buying and selling stock or bonds have been held to be joint adventures where it appeared that the transactions were to be joint and that there was to be a sharing of profits or losses."

30 Am. Jur., *Joint Adventures* § 14, p. 949.

"A joint adventure is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property and services. There is a joint enterprise where all the parties have a community of interest in the purposes and objects of the undertaking and an equal right in its control and management."

17 I.L.E., *Joint Adventures*, p. 51, § 1; *Baker, etc., et al. v. Billingsley et al.* (1956), 126 Ind. App. 703, 132 N.E. 2d 273.

We find that a joint adventure existed in this case, and the trial court was correct in its finding in that respect.

Appellants further contend that even though the Indiana Bank Holding Company Act was violated, the appellees are private parties and therefore are not entitled to its benefits because it is criminal in nature. Appellants cite the case of *Szilagyi v. State* (1967), 249 Ind. 400, 231 N. E. 2d 221, in support of their argument. The *Szilagyi* case, *supra,* can be distinguished from the case presently before us. *Szilagyi* concerned whether the Administrative Adjudication and Court Review Act of 1947 (Burns' Ind. Stat. Ann. § 63-3001, *et seq.*) is applicable to school reorganizations under the Acts of 1959 (Burns' Ind. Stat. Ann. 1966 Cum. Supp. § 28-6101, *et seq.).* The court in that case held that appellants could not rely on all alleged violations of the Hughes Anti-Secrecy Acts (Burns' Ind. Stat. Ann. § 57-601, *et seq.*) because the Act was criminal in nature and afforded no advantage to appellants. The purpose of the Hughes Anti-Secrecy Act is "that all of the citizens of this State are, unless otherwise provided by law, at all times entitled to free and complete information regarding the affairs of government and the official acts of . . . public officials and employees." (Burns' § 57-601) The appellants in the *Szilagyi* case, *supra,* could show no peculiar harm caused to them by violation of the Hughes Anti-Secrecy Act as compared to the harm suffered by the citizens of the state as a whole.

In the present case, unlike *Szilagyi v. State, supra,* the appellees can show a peculiar harm which they will suffer if the Indiana Bank Holding Company Act is violated. The violation or non-violation of the Act in itself is determinative of the case. We think this aspect of the present case is controlled by the holding of *Markley v. Murphy* (1913), 180 Ind. 4, 102 N. E. 376. That case allowed plaintiff to allege the violation of a statute which prohibited the assignment of a debt to a person outside the state for the purpose of attachment or garnishment, although the statute provided as a sanction only a fine. The following paragraph was quoted with approval from Cooley, *Torts* 7:

"When the act or neglect which constitutes a public wrong is especially and peculiarly injurious to an individual, and obstructs him in the enjoyment of some right which the law has undertaken to assure, the offender may be subject to a double liability; he may be punished by the State and he may be compelled to remunerate the individual."

This Court therefore holds that since a violation of the Indiana Bank Holding Company Act would inflict a particular harm on appellees as directors of the Bank of Ireland, they were entitled to raise the violation of the Act as a defense to appellants' quo warranto proceeding. This Court cannot stamp with approval a violation of a criminal act which results in direct injuries to the parties involved in litigation. The old doctrine that a party may not in a court of equity have "unclean hands" and still seek relief, is certainly applicable where a violation of the criminal law is involved.

Since this is a criminal act and should be strictly construed, the appellants contend that the Indiana Bank Holding Company Act is unconstitutional because of indefiniteness when it states that it shall be unlawful for any group to acquire "directly or indirectly" ownership of 25% or more of the voting shares of another bank. We feel the word "indirectly" here has a common, well-known meaning in this statute, i.e., shares held by the real owner in the name of a third party. Our observation is that this is a word in common usage and has a well-known meaning. The appellants cite no case in point in support of their contention. On the other hand, the case of *Hightower v. Detroit Edison Co.* (1933), 262 Mich. 1, 247 N. W. 97 directly supports the appellees' position. We do not find that the appellants have made out a case of unconstitutionality as to the statute.

Appellants next urge that the scope of the relief granted by the trial court is excessive in that it orders a divesting of the majority control which the appellants acquired over

the Bank of Ireland. The appellees make out a case of irreparable injury unless this controlling interest is divested. Equity has such power.

> "Courts of general jurisdiction in Indiana have power to grant equitable relief, not only under statutes, but inherently, as necessary to the complete administration of justice." 12 I.L.E., *Equity*, p. 268, § 3; *Roberts v. Leutzke* (1906), 39 Ind. App. 577, 78 N. E. 635; *Albrecht et al. v. The C. C. Foster Lumber Company* (1890), 126 Ind. 318, 26 N. E. 157.

We find no lack of jurisdiction of the trial court in this case with reference to the method and means to force a divesting of the controlling interest of the appellants, which was illegally acquired. The order that the stock shall not be sold for less than the average price of $35.00 is a protection for the appellants, with which they have no right to complain. It is an attempted preventative against the appellants' stock intersts being sacrificed at a loss to them. *Peoples Savings Bank v. Stoddard* (1960), 359 Mich. 297, 102 N. W. 2d 777; *Schine Chain Theatres v. United States* (1948), 334 U. S. 110, 68 S. Ct. 947, 92 L. Ed. 1245.

We find no errors in the trial court's admission with reference to the stockholdings of appellant and others in the Dubois County Bank along with certain family employment and professional relationships of the shareholders. This was all relevant evidence in showing whether or not the appellants had control of 25% or more of the voting shares of the Dubois County Bank. We further find no merit in appellants' contention that the court should not have admitted the application of appellants before the Department of Financial Institutions to acquire the outstanding stock of the Bank of Ireland. This appears to us to be entirely relevant to the issue of the motives and intentions of the appellants engaged in a joint enterprise.

We come next to the trial court's awarding of attorney fees to appellees in the amount of $10,000.00. We find no

authorities in equity or any statute in this state which permits, in a situation of this type, the awarding of attorney fees to the successful party against the losing party.

"Generally there cannot be recovery as damages for the expenses of litigation, and the damages recoverable in an action cannot include an allowance to plaintiff for loss of time in bringing it. A contract may contain a stipulation for the payment of attorney's fees. A losing party is never entitled to attorney's fees as damages." 9 I.L.E., *Damages*, § 48, p. 342; 22 Am. Jur. 2d, *Damages*, § 165, p. 234.

In view of what we have said, the trial court is directed to strike from its judgment the allowance of any attorney fees to the appellees, and the judgment, as so modified, is now affirmed.

DeBruler, C. J., and Hunter and Givan, JJ., concur. Jackson, J., concurs in result.

NOTE.—Reported in 248 N. E. 2d 32.