HONEY CREEK CORPORATION, NORTH PARK APARTMENTS, INC. AND GUTHRIE MAY *v.* WNC DEVELOPMENT COMPANY AND SEARS, ROEBUCK & CO.

[No. 1-874A124. Filed July 23, 1975. Rehearing denied August 28, 1975. Transfer denied March 25, 1976.]

*Robert H. Hahn, Jeffrey R. Kinney, Bamberger, Foreman, Oswald and Hahn,* of Evansville, for appellants.

*Robert S. Ratcliffe, Dix, Patrick, Ratcliffe & Adamson,* of Terre Haute, for appellee WNC Development Co.; *James L. Crawford, Cox, Zwerner, Gambill & Sullivan,* of Terre Haute, for appellee Sears, Roebuck & Co.

LOWDERMILK, J.—This case arose when the cooler unit of an air conditioning system was damaged because it failed to stop operating after the stop button was pushed by an employee of defendant-appellee, Sears Roebuck & Co. (Sears and/or Tenant), a tenant in Honey Creek Square Shopping Center of Terre Haute. Due to the sale of the shopping center, a corporate merger, and a corporate name change, a complicated fact situation arose as to the party who would ultimately have to bear the loss. To the credit of all the parties involved, it was stipulated that the original landlord, defendant-appellant North Park Apartments, Inc., (North Park) was liable unless North Park could show that Sears was negligent in the operation of the system under the following clause of its lease agreement:

"Tenant agrees that Tenant will, at its own expenses, make all repairs and replacements to or upon the demised

premises which become necessary during Tenant's occupancy of said premises, by reason of the fault or neglect of Tenant or of Tenant's employees. . . ."

As a result of the stipulations, the trial was essentially a dispute between the two named defendants, North Park Apartments, Inc., and Sears, Roebuck & Co.

The jury found that Sears was not negligent in the operation of the air conditioning system, and judgment was subsequently entered against North Park. North Park appeals from the negative judgment, contending Sears was negligent as a matter of law and that the judgment entered by the trial court was therefore contrary to law. North Park also claims error in the failure of the trial court to give North Park's instructions numbered 2, 5, and 8, and, further, that these and other errors deprived North Park of a fair trial. The award of attorneys' fees is also challenged.

The facts most favorable to Sears are as follows. On the night of June 7, 1971, the credit manager of Sears, Joseph Munoz, began the customary procedure for the nightly closing of the Sears store. These duties rotated among the four top management personnel at the Sears store; Mr. Munoz had completed this same procedure a few dozen times before.

One of the first tasks completed each night in closing the store was the shutdown of the air conditioning system. Mr. Munoz's uncontradicted testimony was:

"Q. How long did it take the wind-down of the chiller?
A. No more than, I would say, thirty seconds to a minute; it always—by the time I had finished with the other switches—was just about wound down completely.
Q. Thirty seconds for the chiller wind-down, a minute or so for the pump to kick out?
A. Approximately—I would say that's correct.
Q. And you were taught by Mr. Schulz to listen for these sounds and to wait until you had heard them before leaving the premises?
A. That was part of the instructions, yes.
Q. Whether you did that, sir, on the evening of June 7, 1971.

A. Yes, I did.

Q. Are you stating to this Court and Jury now that the chiller went through this process of thirty seconds winding down?

A. It's exactly the way I remember it, yes; nothing happened any different than any other night.

Q. You say that's the way you remember it?

A. Yes, sir.

Q. Well, don't you know as a fact, sir, that the chiller did not stop that night but continued to operate?

A. No, I don't know that."

\* \* \*

"Q. And you testified, I believe, that the first procedure you initiated on June 7, 1971 was to push a stop button or an off button?

A. Yes.

Q. What happened then with respect to any of the lights on the panel there near the stop switch?

A. A green light immediately went out and a red light went on.

Q. I believe you also stated that you pushed two off buttons on the circulating pumps and then you pushed an off button on the cooling fan and that you shut off a chemical—or a lime feeder—chemical?

A. Yes.

Q. And is that the same procedure that you had used on all occasions prior to June 7, 1971 with respect to shutting off the air conditioning system?

A. Yes, sir, it was.

Q. And was the sound of the winding down—or coasting down—you referred to the same as the sounds you had heard on each occasion as you shut off the air conditioning system prior to June 7, 1971?

A. Yes, it was.

Q. And was the sound that you refer to as the oil pump shutting off the same sound that you had heard on each occasion prior to June 7, 1971 when you shut off the system?

A. Yes, it was."

\* \* \*

"Q. Was it your belief when you left that machinery room on June 7, 1971 that the equipment had turned off?

A. Yes, it was.

Q. The air conditioning system?
A. Yes, it was.
    Mr. Crawford: No further questions.

*Redirect Examination of Joseph J. Munoz*
Questions by Mr. Hahn:

Q. Well, its not a matter of belief, is it, sir? It was off according to your testimony.
A. Yes, sir.
Q. Had stopped completely?
A. Yes, sir."

It was stipulated that sometime that night or early the next morning the cooler unit began or continued to operate due to a defective switch. Since the lubricating pumps were not operating, the cooler soon overheated and effectively "burned up", causing $18,720.50 damage. The red stop light was still on when the damage was discovered the following morning.

North Park contends that Sears was negligent in not instructing its employee in the proper operation of this expensive equipment. Mr. Munoz testified that he was not shown the operation manual nor instructed to familiarize himself with its provisions. The manual, which was in the equipment room and available to all personnel, contained the following notation on page 23:

"NOTE: Should the machine fail to stop, pull main circuit breaker. DO NOT restart machine until malfunction is located and corrected."[1]

Although Mr. Munoz had a general idea as to the location and use of the main circuit breaker, he testified that he was not shown by his employer where the circuit breaker was located, nor was he instructed in its use.

It is North Park's contention that the failure of Sears to train its employee in the proper operation of the chiller unit was negligence as a matter of law. For this reason, they claim that the judgment below should be reversed and judgment

---

1. The 100 page manual also contained a wide variety of complicated material, including many schematic diagrams and instructions for other kinds of equipment not present in the Sears store.

entered for North Park, or in the alternative, that a new trial should be granted.

Sears contends that the issue on this appeal is whether Sears committed any act or omission of negligence which was a proximate cause of the damage in question.

A proximate cause of damage is that cause which sets in motion the chain of circumstances leading up to the damage and has been defined as that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, *produces the result complained of and without which the result would not have occurred.* *New York Central R.R. Co.* v. *Cavinder* (1965), 141 Ind. App. 42, 211 N.E.2d 502; *Moran* v. *Poledor* (1926), 84 Ind. App. 266, 151 N.E. 140.

Here, North Park contends that Sears failed to train their employees, and that that failure was the proximate cause of the damage done to the chiller unit. However, it is not shown how Sears could have trained their employees so as to avoid the damage to the chiller unit.

There is sufficient evidence in the record from which the jury could find that any such alleged negligence was not the proximate cause of the damage.

It was stipulated that the pulling of the main circuit breaker would have prevented the damage. That was not, however, the usual or the recommended procedure in the day-to-day operation of the unit. While the manufacturer's manual indicated that the pulling of the main circuit breaker was the required action in the event certain problems developed, there is no indication in the manual as to how to determine that a problem does in fact exist. The only instruction in the manual is to the effect that if the unit fails to stop when the stop button is pushed, then the main circuit breaker should be pulled until the problem is corrected.

The evidence is uncontradicted that the stop light came on when the stop button was pushed, and that the machine wind-down noise was heard. Further, Mr. Munoz testified that the

wind-down noise had stopped when he heard the circulating pumps turn off a short time later. There is evidence that this is what should have happened under normal operating conditions.

Mr. Erhardt, the Mechanical Engineering Supervisor for the Midwest Territory of Sears, testified that the wind-down noise would be heard, and the red stop light would come on, even if there was a malfunction in the system such as occurred here.

The record does not disclose any method by which the operator could discover the faulty switch in this case, so as to prevent the damage that occurred here.

North Park argues that Sears has stipulated that the chiller unit did not stop operating on the night of June 7, 1971, and should be bound by that stipulation. A careful reading of the stipulation discloses that Sears conceded only that the machine operated at some point after the shut down procedure and caused the damage. They did not stipulate that the unit continued operating at the time of shutdown, or that if it was operating, such defect would be discoverable by the operator of the unit. At most, Sears stipulated that a switch failed to disengage, but from the expert testimony it is clear that such stipulation does not necessarily contradict the testimony of Mr. Munoz.

It is clear from the above that there was no practical way that the operator of the unit could discover the defect that caused this damage. This would be true even if the operator knew where the main circuit breaker was located, and even if he had read and was intimately familiar with the instruction manual.

The jury could have found that the result would have occurred whether or not there was any negligence. Further, there was conflicting evidence on the question of whether Sears properly informed its employees as to the proper procedure to shut off the chiller. There was a conflict in the evidence as to whether the instruc-

tion manual was adequate. Inasmuch as the facts are conflicting and it is our opinion reasonable men would not be expected to reach a conclusion under that evidence contrary to the verdict reached by the jury, the verdict of the jury was not contrary to law.

*Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N.E.2d 669, sets out the guidelines to determine whether a decision is contrary to law, and states:

"It is only where the evidence is without conflict and can lead but to one conclusion, and the trial court has reached an opposite conclusion, that the decision of the ▆ trial court will be set aside on the ground that it is contrary to law."

North Park next objects to the court's refusal to give to the jury North Park's tendered instructions numbered 2, 5, and 8.

North Park insists the failure to give these instructions resulted in the jury not being fairly and fully informed in respect of the issues to be decided by it and relies on *Jackman* v. *Montgomery* (1974), 162 Ind. App. 558, 320 N.E.2d 770, and *Barnes* v. *Deville* (1973), 155 Ind. App. 387, 293 N.E.2d 54, 57.

North Park urges that Instructions 2 and 5 were not covered but admits there was an attempt to cover them by court's final instruction number 4, which was a general pattern instruction on negligence. North Park further urges that said instructions defined the *tenant's duty* and the same was not covered under the court's final instructions as to Sears or its employee, Munoz.

North Park urges the same error in the failure to give North Park's tendered instruction number 8 which was for the purpose of instructing the jury as to intervening concurrent causation under the rule set forth in *New York Central R.R. Co.* v. *Cavinder, supra.*

North Park contends that the malfunction of the chiller had been specifically anticipated and warned against by the

manufacturer. North Park claims that the fact the malfunction resulted from a defective primary control relay is immaterial inasmuch as the problem warned against by the manufacturer occurred as a result of the defective primary control relay and had the manufacturer's instructions been followed no damage would have occurred.

North Park further insists that it was entitled to the instruction as the fact that the damage was caused by a defective switch would not, in and of itself, absolve Sears from any responsibility, as Sears was defending on the basis that the defective relay was the sole cause of the damage.

Sears urges that the court's instructions adequately cover any alleged defects urged by North Park in its tendered instructions 2, 5, and 8, and, therefore, there was no error in refusal to give said tendered instructions 2, 5, and 8, and cites 28 I.L.E., Trial, Sec. 247 (1960), pp. 253-255. They rely as authority on *Ashton* v. *Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210, and *Lamb* v. *York* (1969), 252 Ind. 252, 247 N.E.2d 197. Sears urges that the "test" is that all that is required is that the instructions given substantially cover the material given in the refused instruction, and cites *Leppert Bus Lines, Inc.* v. *Rayborn* (1962), 133 Ind. App. 325, 182 N.E.2d 260, wherein this court stated:

> "There is a well settled rule of law in this state that it is not error for the trial court to refuse to give an instruction where its subject matter is adequately covered by other given instructions. . . . The above rule also applies even where the refused instruction appears more appropriate than the one given. . . ."

It is our opinion that the court adequately covered North Park's tendered instructions in other instructions given by the court.

The general test on appellate review with respect to the impact of errors is whether it appears that a right result was reached. To ignore the errors the court must be affirmatively convinced that the right result was reached, notwithstanding

the errors in the record. See, 2 I.L.E., Appeals, Sec. 632 (1957), pp. 677-680.

Where it is apparent that the right result has been reached by the jury, and the giving or refusal of a particular instruction did not mislead the jury or prejudice the rights of the parties, no reversible error exists. *David Johnson Co., Inc.* v. *Basile* (1964), 136 Ind. App. 611, 199 N.E.2d 478; *Supreme Council Catholic Knights of America* v. *Logsdon* (1915), 183 Ind. 183, 108 N.E. 587.

Here, it has already been determined that the jury reached the right result on the issue of proximate cause. If any error was committed in refusing North Park's tendered instructions on what constituted negligence, it was harmless error. The jury was not misled on the issue of proximate cause, and no prejudice resulted because of the trial court's refusal to give North Park's tendered instructions.

The last issue presented by the appellants is the award of attorneys' fees to plaintiff-appellee, WNC Development Co., (WNC) and against defendant-appellant, Guthrie May (May), on May's guaranty that is in words and figures as follows, to-wit:

"2. That at the closing under said contract none of the tenants or lessees of space in said Shopping Center shall have claims of offsets or on account of payment of advance rentals except as shall be disclosed and adjusted between the parties at the closing and that Honey Creek Square, Inc., will indemnify and save WNC DEVELOPMENT COMPANY harmless of and from any and all claims (and expenses on account thereof) by reason of any such off-setting claims or advance rentals not disclosed at the closing; . . ."

It has long been the rule that the right to recover attorneys' fees from one's opponent does not exist in the absence of a statute or some agreement. *Trotcky* v. *VanSickle* (1949), 227 Ind. 441, 85 N.E.2d 638; *Gavin* v. *Miller* (1944), 222 Ind. 459, 54 N.E.2d 277. The question presented here is whether or not the trial court's finding, i.e., that the contract term "and expenses on account thereof" in-

cludes within its ambit the expense of plaintiff's attorneys' fees in bringing the action, is sustained by sufficient evidence.

There are several preliminary questions involved. It should first be noted that much of the case law in Indiana that considered the question of whether or not the term "expenses" includes attorneys' fees involved only a question of statutory construction; i.e., purely questions of law. See *State* v. *Holder* (1973), 260 Ind. 336, 295 N.E.2d 799; *Hutts* v. *Martin* (1893), 134 Ind. 587, 33 N.E. 676; *In re Guardianship of Carrico* v. *Bennett* (1974), 162 Ind. App. 330, 319 N.E.2d 625.

The question or the propriety of an award of attorneys' fees has also arisen in cases where there was neither a statute nor a contract provision involved. *State ex rel. Uebelhor* v. *Armstrong* (1969), 252 Ind. 351, 248 N.E.2d 32; *Gavin* v. *Miller, supra; Perry County Council* v. *State ex rel. Baertich* (1973), 157 Ind. App. 586, 301 N.E.2d 219. This, too, is a question of law for the court.

In this case, however, there is a contract provision that allegedly allows for the award of attorneys' fees. A contract that allows for the recovery of attorneys' fees will be enforced according to its terms if the contract is not contrary to law or public policy. *Employers' Liability Assurance Corp.* v. *Citizens Nat'l Bank of Peru* (1926), 85 Ind. App. 169, 151 N.E. 396.

The question then becomes whether or not *this* contract provided for the recovery of attorneys' fees. This is a question of fact for the trial court to determine in the case at bar. It's determination will not be disturbed on appeal if it is supported by sufficient evidence. *Phar-Crest Land Corp.* v. *Therber* (1969), 251 Ind. 674, 244 N.E.2d 644. We cannot say that the trial court's determination was wrong in this regard.

May contends, however, that an award of attorneys' fees should be limited to the fees incurred to enforce the lease itself, and not for the fees incurred in an action to enforce the guaranty. His contention is that the guaranty covers the

152

expenses of collecting the rentals due, not the expenses of enforcing the guaranty, citing the case of *Employers' Liability Assurance Corp.* v. *Citizens Nat'l Bank of Peru, supra,* where the plaintiffs sought the cost of defending a claim but did not request attorneys' fees with respect to the prosecution of its claim against the indemnitor itself.

This contention is without merit in light of the case of *Smith* v. *Ostermeyer Realty Co.* (1935), 102 Ind. App. 164, 197 N.E.2d 743. There, a lessee agreed to pay attorneys' fees in case of default of rents, and a guarantor agreed to carry out and perform any and all agreements of the lease. The court held that the lessor was entitled to recover attorneys' fees for his suit against the guarantor to enforce the guaranty contract. .

The trial court's award of attorneys' fees in the stipulated amount of $2,500.00 is affirmed.

WNC has filed a subsequent petition with this court, praying the award of an additional $2,500.00 attorneys' fees for additional services rendered as a result of appellants' appeal of this cause.

We have determined that the stipulation entered into at the trial below for $2,500.00 attorneys' fees bars any further recovery of attorneys' fees in this court, under the theory of merger set forth in *McCormick* v. *Falls City Bank* (7th Cir., Ind. 1893), 57 F. 107. In that case, the court said:

> "The collateral note on which the judgment in this court was rendered contained a stipulation for the payment of attorneys' fees. This stipulation, under the firmly settled law of this state, was valid. When the bank took judgment in this court on the collateral note, there was included in the judgment the sum of $200 as a reasonable attorneys' fee for the collection of the same. The stipulation for attorneys' fees contained in the note was merged in that judgment. The fact that the judgment was appealed from and affirmed gives no right or claim for the recovery of additional attorneys' fees. The amount of attorneys' fees in all such cases is settled by the judgment of the trial court once for all." See also, Annot., 52 A.L.R.2d 863.

WNC's attorney prepared and filed with this court a very adequate brief which touched on all specifications of the motion to correct errors, including payment of attorneys' fees. He also appeared in this court and made a convincing argument in support of his brief.

We believe that counsel should be paid a fair and adequate amount for the work done in the representation of clients. However, under the law in Indiana, as heretofore determined, we are constrained to hold that WNC's petition for *additional* attorneys' fees which was occasioned by this appeal must be and is hereby denied.

Judgment affirmed.

Robertson, C.J., and Lybrook, J., concur.

NOTE.—Reported at 331 N.E.2d 452.