**MESA PARTNERS, a Texas partnership, Plaintiff,**

**v.**

**PHILLIPS PETROLEUM COMPANY, a Delaware corporation, Defendant.**

Court of Chancery of Delaware,
New Castle County.

Submitted Dec. 17, 1984.

Decided Dec. 20, 1984.

Charles F. Richards, Jr., Edmund N. Carpenter, II, Samuel A. Nolen, Thomas A. Beck, and Daniel J. Kaufman of Richards, Layton & Finger, Wilmington; Baker & Botts, Houston, Tex., for plaintiff Mesa Partners.

Martin P. Tully, Thomas Reed Hunt, Jr., Lawrence A. Hamermesh, and David A. Jenkins of Morris, Nichols, Arsht & Tunnell, Wilmington; Herbert M. Wachtell of Wachtell, Lipton, Rosen & Katz, New York City, for Phillips Petroleum Co.

WALSH, Vice Chancellor.

This action began as an effort by the plaintiff, Mesa Partners, a Texas partnership,[1] to secure a declaratory judgment that it was not obligated to refrain from attempting to acquire shares of stock, and ultimately control, of Phillips Petroleum Company ("Phillips") by reason of the execution by Mesa Petroleum Company ("Mesa") of an agreement dated January 6, 1983. This agreement ("the Standstill Agreement") between Mesa and General American Oil Company of Texas ("GAO") resolved the competition between Mesa and Phillips for the acquisition of GAO. By virtue of that agreement, Mesa retired from the battle, was compensated for its abortive efforts and Phillips acquired GAO. Phillips claims the agreement had the further effect of restricting Mesa from launching any effort to acquire an interest in Phillips within five years of its execution. In effect, Mesa now seeks a preemptive ruling that the agreement does not limit its proposed plan of acquisition.

I

Mesa commenced this action on December 5, 1984, the day following its announcement of a tender offer for 23 million shares of Phillips' stock at $60 per share. Since that time Mesa and Phillips have filed a succession of suits in various jurisdictions to counter or anticipate the other's move. In order of filing these actions include: (a) an action by Mesa in the United States District Court for Delaware on December 4, 1984, to enjoin the enforcement of the Delaware Tender Offer Act (8 Del.C. § 203), (a rite of passage in tender offer litigation in this jurisdiction) and to decide the Standstill Agreement under the claim of pendant jurisdiction; (b) the present action, commenced the following day; (c) the *ex parte* securing of a temporary restraining order by Phillips in Washington County, Oklahoma to prevent Mesa from moving against Phillips contrary to Phillips' view of the Standstill Agreement; (d) further resort to this Court to restrain Phillips from pursuing its Oklahoma action and the seeking of supplemental relief in the United States District Court to prevent Phillips from initiating any proceeding in any other federal court and (e) an action in a Louisiana State Court, at the apparent behest of Phillips, to prevent Mesa from attempting

---

**1.** Although the Partnership is the only plaintiff here, there is no basis, for present purposes, to distinguish it from the various operating companies it controls.

to acquire an interest in certain of Phillips' assets in that State, through control of Phillips, without prior approval of State regulatory agencies.

After two weeks of moves and counter-moves, during which Mesa moved and later withdrew a motion to consolidate the hearing for preliminary injunction with a final hearing and Phillips sought unsuccessfully in this proceeding to restrain Mesa from acquiring any interest in Phillips pending the preliminary injunction hearing, the matter has come to rest at the preliminary injunction stage. Both the United States District Court and the Oklahoma Court, the latter reluctantly, have deferred to this Court's determination of Mesa's claim for preliminary injunctive relief.

## II

The extensive discovery record which has been developed on an accelerated basis provides an insight into the events which transpired on January 5 and 6, 1983, when Mesa and Phillips negotiated the fate of GAO. The scenario began on December 20, 1982, when Mesa launched a hostile tender offer for a 51% controlling interest in GAO. Mesa's tender offer was two-tiered but its only price commitment was to purchase shares in the first step at $40 per share. GAO responded three days later with a self-tender offer for 31% of its shares at $50 per share. The usual flurry of litigation followed in several jurisdictions as Mesa sought to enjoin GAO's self-tender. By December 30, 1982, Mesa claimed to have achieved a tender of more than 77% of GAO stock but was unable to take down those shares because the depositing shareholders were free to withdraw their shares in favor of GAO's self-tender by January 7, 1983. That date was also the time fixed for a hearing on a preliminary injunction in Mesa's suit against GAO pending in the United States District Court for Delaware.

In the meanwhile, GAO's investment banker, First Boston Corporation, was seeking a "white knight" to rescue GAO from the unwanted attention of Mesa. Phillips expressed interest in such a role and began negotiations with GAO looking toward a possible acquisition. Eventually, Phillips and GAO were able to agree on the basic terms of merger which included, *inter alia*, the payment by Phillips of $45 per share through direct acquisitions from certain large shareholders and by securing the shares to be realized from the GAO self-tender which would continue. Key to the consummation of the deal, however, was a settlement with Mesa. Acting through their investment bankers, GAO and Mesa began negotiating for Mesa's exit from the scene. At first, GAO would not identify its white knight but eventually Phillips was disclosed and direct negotiations ensued with Joseph G. Fogg, of Morgan Stanley acting on behalf of Mesa and Geoffrey Boisi of Goldman, Sachs acting for Phillips. Phillips' basic approach was to persuade Mesa to abandon its tender offer in favor of the GAO self-tender. In the process Mesa would be able to sell its previously acquired block of GAO shares and be compensated for its expenses.

By January 5, the negotiations had reached the point where it was desirable for the Chief Executive Officers of both companies to talk directly. On the evening of January 5, T. Boone Pickens, Mesa's CEO, who was in New York, spoke by telephone to William C. Douce, Phillips' CEO, who was at a hunting lodge in Georgia. Douce described the conversation as a candid and friendly one in which the terms of Mesa's withdrawal were discussed. Pickens appeared interested in broadening the negotiations to include the sale of oil rigs and "other deals" but Douce indicated he was interested only in securing GAO and its assets for Phillips. Eventually, it was agreed that Mesa would be paid $15 million for its "expenses" in the GAO affair. Douce claims that he also told Pickens that it would be necessary for Mesa to execute a standstill agreement as to "GAO and its assets" but he did not talk "specifically" about Phillips Petroleum. Pickens

does not recall any discussion concerning a standstill agreement.

After the respective CEOs had reached agreement on the terms of Mesa's withdrawal, Douce contacted Phillips' headquarters in Bartlesville, Oklahoma, advised them of the terms and requested that an implementing agreement be prepared and sent to Pickens in New York. At this point events become disputed with each side offering a different version of the circumstances under which the agreement was prepared and executed. It is clear, however, that basic responsibility for the drafting of the Standstill Agreement fell to GAO's counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") while Phillips' counsel, Fried, Frank, Shriver, Harris and Jacobsen ("Fried Frank") were assigned responsibility for preparing the volumnious documents needed to effectuate the GAO-Phillips agreement. The two firms did confer concerning the language of the Standstill Agreement and reached an understanding to use a "subtle" approach to secure Phillips inclusion in the Standstill Agreement without specific use of its name. It was agreed to use language in the agreement which by implication could be construed to apply to Phillips. This approach was consistent with the views later expressed by Phillips' executives that it did not want to appear apprehensive over the need to protect itself from a "raid" by Pickens through insisting on a specific identification in the Standstill Agreement. In other words, if Phillips were perceived to be "running scared" it might whet Pickens' appetite.

Phillips contends that the Standstill Agreement drafted by Fried Frank and Wachtell Lipton was also reviewed by Mesa's law firm—Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps") but it is unable to identify any individual at that firm who had a hand in the drafting of the agreement and in view of events which

transpired later, it is highly unlikely that Mesa's attorneys had any direct input.[2] It is also clear that the Standstill Agreement was not an original work of legal draftsmanship. In both form and language it tracks a similar agreement dated June 18, 1982, also prepared by the Wachtell Lipton firm, under which Mesa withdrew from the contest for control of Cities Service Company at the behest of Gulf Oil Company. Indeed, paragraphs 2 and 3 of the respective agreements, which form the heart of this dispute, are almost identical.

The agreement between Mesa and GAO appears on the letterhead of Mesa and is addressed to GAO. In paragraph 1, it recites the receipt of $15 million dollars "in lieu of payment of our expenses incurred in connection with our outstanding cash tender offer * * * for shares of * * * GAO." Paragraphs 2 and 3 provide:

2. We hereby agree that for a period of five years from the date hereof, neither we nor any Affiliate (as that term is defined in Rule 405 under the Securities Act of 1933) of ours (regardless of whether such person or entity is an Affiliate on the date hereof) will (a) acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any voting securities or direct or indirect rights or options to acquire any voting securities of GAO, (b) make, or in any way participate, directly or indirectly, in any "solicitation" of "proxies" to vote (as such terms are used in the proxy rules of the Securities and Exchange Commission), or seek to advise or influence any person or entity with respect to the voting of any voting securities of GAO, (c) form, join or in any way participate in a "group" within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934 with respect to any voting securities of GAO, or (d) otherwise act, alone or in concert with others, to seek to control or influence the man-

---

2. Joseph Flom, Skadden Arps' Senior partner who was present when the agreement was received by Pickens, described its appearance as

"almost *deus ex machina,*" *i.e.,* suddenly out of the sky.

agement, board of directors or policies of GAO. We acknowledge that GAO would not have an adequate remedy at law for money damages in the event that this convenant were not performed in accordance with its terms and therefore agree that GAO shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity. Notwithstanding the foregoing, the preceding restrictions on us pursuant to this paragraph 2 shall terminate in the event that GAO or any of its Affiliates should take any action with respect to us or our voting securities which action, if taken by us or any Affiliate of ours with respect to GAO or its voting securities, would violate this paragraph 2.

3. We and GAO will each dismiss with prejudice the lawsuits listed in Schedule I hereto, and we and GAO hereby release and discharge each other (and each other's present and former directors, · officers, employees, parents, predecessors, successors, assigns, subsidiaries and affiliates) from all manner of claims, actions, causes of action or suits, in law, or equity, which each of us now has or hereafter can, shall, or may have by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement, arising out of, in connection with, or in any way related to, purchases or sales of, or attempts to purchase or sell, by anyone securities of GAO excepting only any action, cause of action or suit arising by virtue of this Agreement.

The remaining paragraphs deal with the termination of the Mesa tender offer, noninterference with the GAO self-tender and warranties as to authority to contract. Paragraph 7, provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Delaware."

Once the Standstill Agreement had been drawn, it was delivered on January 6, 1983, to Mesa's representatives who were gathered in the conference room at Morgan Stanley. When the agreement arrived it was reviewed and discussed. Present at that time in addition to Pickens were: Messers. Madden, Batchelder and Tassin, all executives of Mesa; Joseph Fogg, Simon Orme and Charles Short of Morgan Stanley, accompanied by Jesse Lovejoy counsel for Morgan Stanley; and Joseph Flom and Blaine Fogg of Skadden Arps. Each of these individuals has been deposed and have given varying recitals of what occurred prior to Pickens' execution of the agreement. The Mesa executives, including Pickens, claim they were advised the Standstill Agreement did not cover Phillips. The Morgan Stanley representatives, with varying degrees of certitude, contend that Fogg advised Pickens that Phillips was covered by the agreement. Flom, whose recollection was less than categorical, testified that he did not advise Pickens that Phillips was not covered by the agreement but he is unsure whether anyone advised Pickens that Phillips was covered by the agreement. He indicated that "various possibilities of interpretation" were discussed but the issue of a Phillips standstill was not of prime concern to him because Pickens had indicated on that occasion, and earlier, that he had no interest in Phillips "because they were friends of his."

Two other lawyers present have clearer recall of the discussion. Blaine Fogg recalled that there was a general agreement that because the Standstill Agreement didn't specifically mention Phillips, it did not include it. Lovejoy, who no longer represents Morgan Stanley but is employed by another investment banker, specifically recalls the discussion concerning whether the agreement covered Phillips. He expressed the judgment that since the agreement did not mention Phillips or any other possible acquiror and did appear to restrict purchases of the securities of any company but GAO, it did not apply to Phillips.

The agreement was signed by Pickens and accepted by GAO. Phillips thereafter completed its negotiations with GAO, with

the latter proceeding to complete its self-tender. By virtue of a short form merger under Section 253 of the Delaware Corporation Code on March 8, 1983, GAO ceased to exist and Phillips became the survivor. In subsequent press releases, public announcements and filings with the Securities and Exchange Commission Phillips did not indicate that it was the recipient of a Standstill Agreement which protected it from future acquisition of its stock by Mesa.

### III

Mesa contends that, on its face, the Standstill Agreement applies only to GAO and that extrinsic evidence need not, and should not, be considered to glean its intent. If such evidence is considered, however, Mesa argues that the weight of that evidence supports its interpretation. Phillips attacks Mesa's position at the threshold. It argues that Mesa is improperly seeking an advisory opinion from the Court in the guise of a request for a declaratory judgment. In any event, Phillips claims it is entitled to the benefit of the agreement both by its language and through operation of law as the successor to GAO.

■ It is necessary at the outset to deal with the contention that Mesa's request for relief through definition of the Standstill Agreement at the preliminary injunction stage is inappropriate and premature. An application for a preliminary injunction is addressed to the discretion of the Court and, in its usual form, is intended to preserve the status quo pending a final hearing on the merits. *Gimbel v. Signal Companies, Inc.*, Del.Ch., 316 A.2d 599 (1974); *aff'd.*, Del.Supr., 316 A.2d 619 (1974). *Sandler v. Schenley Indus., Inc.*, Del.Ch., 32 Del. 46, 79 A.2d 606 (1951). Phillips argues that under the status quo which existed prior to the filing of this action, Mesa had not been threatened with enforcement of the Standstill Agreement by Phillips or anyone else. There is thus no reason to seek a ruling on the meaning of the Standstill Agreement short of a final hearing. Mesa, of course, commenced its

tender offer, now in abeyance, before it filed its action in this Court. Delay in a tender offer may, in itself, constitute irreparable injury since it is recognized as "the most potent weapon for incumbent management." *Kennecott Corp. v. Smith*, 3rd Cir., 637 F.2d 181, 189 (1980). But whatever merit that argument may have had when this action was commenced, the events which have occurred since December 5 have considerably eroded it.

Leaving aside the Louisiana action, the effect of which is uncertain, the securing by Phillips of an *ex parte* temporary restraining order in Oklahoma the day after this action was filed completely altered the status quo. The petition filed by Phillips in the Washington County District Court invoked the Standstill Agreement as the basis for injunctive relief and claimed that Mesa's proposed tender offer for Phillips stock "would breach" the agreement. The order which responded to Phillips' petition specifically enjoined Mesa from proceeding with its announced tender offer. Although the Oklahoma Court has since deferred to this proceeding as prior-filed, that Court *sua sponte* extended the restraining order on December 14, 1984, although neither party appeared at the hearing. It is clear that, at present, Mesa risks the threat of irreparable injury which can be avoided only by relief in the forum where the substantive claim has been first filed. The interpretation of the Standstill Agreement by this Court, applying the law selected by the parties, would be no more an advisory opinion than would a ruling by the Oklahoma Court in response to Phillips' petition to enforce the standstill agreement against Mesa.

### IV

■ The next, and crucial, determination is whether Mesa has demonstrated a reasonable probability that it will succeed at final hearing in proving that the Standstill Agreement does not run to Phillips' benefit. Without such a showing a preliminary injunction is not earned and will not issue.

*Lenahan v. National Computer Analysts Corp.*, Del.Ch., 310 A.2d 661, 664 (1973). Phillips views the present proceeding as one seeking the issuance of mandatory injunctive relief and thus presses for the application of a higher standard of proof—the clear establishment of a legal right. *Steiner v. Simmons*, Del.Supr., 35 Del. 83, 111 A.2d 574 (1955). I am not persuaded that the relief Mesa seeks, with one exception, requires the performance of affirmative acts or the desisting from a presently contemplated course of action, at least so far as Phillips' conduct is concerned. The one exception, of course, is the pursuit by Phillips of the Oklahoma action. Mesa asks not only that the temporary restraining order already in effect be continued but that Phillips be required to dismiss that action. It seems, however, that the mandatory aspect of injunctive relief can be otherwise resolved as will appear hereafter. For present purposes then, the usual standard for showing probability of ultimate success will be applied.

## V

This brings us to the underlying substantive question of the meaning of the Standstill Agreement. At the outset it is necessary to determine whether an interpretative tool, the parol evidence rule, should be used to plumb the meaning of the Standstill Agreement. Each party suggests that application of the parol evidence rule is unnecessary, because the document is clear on its face. Each party, however, also has a fallback position for the purpose of demonstrating, through the attendant circumstances, what the parties intended.

 The parol evidence rule is based upon the salutary principle that once the parties to an agreement fix the language which reflects their understanding, evidence which suggests a different meaning should not be received. *Gluckman v. Holzman*, Del.Ch., 29 Del. 458, 51 A.2d 487 (1947); *Cities Service Company v. Gardiner, Inc.*, Del.Super., 344 A.2d 254 (1975), *appeal dismissed,* Del.Supr., 349 A.2d 744

(1975). But where a contractual provision is susceptible to more than one meaning or where uncertainty exists as to the application of, or intended purpose for, the selected language, the attendant facts which constitute the setting for the contract are deemed admissible because they are helpful. *Cleveland Trust Co. v. Wilmington Trust Co.*, Del.Supr., 258 A.2d 58 (1969); *Gluckman v. Holzman, supra; Cities Service Company v. Gardinier, Inc., supra.*

It is not disputed that the Standstill Agreement is a two-party instrument. The only parties specifically identified in the document are Mesa and GAO. They are also the only signatories to the agreement. Mesa is content to rest upon that alignment. Phillips, for its part, seeks to make the agreement a three-party instrument by contending that certain provisions of the agreement could be read to include a protected party other than GAO. These disputed provisions all appear in paragraph 2 of the agreement.

 Phillips first points to the language in subpart (a) which restricts Mesa from "directly or indirectly" acquiring any voting securities or voting rights in GAO. Phillips contends this language is ambiguous because the language was understood by both sides as including Phillips. This argument, however, misapplies the parol evidence rule. The language must appear ambiguous before evidence outside the writing is applied. The outside evidence cannot create the ambiguity. In any event, the language "directly and indirectly" as it applies to a restriction on acquisition, is commonly understood as embracing the use of a third party or an intermediary device to accomplish the prohibited objective. *State ex rel. Uebelhor v. Armstrong*, Ind.Supr., 252 Ind. 351, 248 N.E.2d 32 (1969). Phillips does not suggest that Mesa intends the use of a third-party or intermediary in its effort to control Phillips. Moreover, GAO ceased to exist as a separate entity capable of issuing any securities as of March 8, 1983, and it presently cannot be the subject of any acquisition by

Mesa. There is no merit to this claim of ambiguity.

Phillips next contends that subsection (d) of paragraph 2 which prohibits Mesa from seeking "to control or influence the management, board of directors or policies of GAO" extends the standstill to Phillips by virtue of its subsequent acquisition of GAO. This contention is subject to the infirmity previously noted. With the demise of GAO as a functioning corporate entity there was no management, board or policies subject to interference.

■ Finally, Phillips points to the final sentence of paragraph 2 which provides:

Notwithstanding the foregoing, the preceding restrictions on us pursuant to this paragraph 2 shall terminate in the event that GAO or any of its Affiliates should take any action with respect to us or our voting securities which action, if taken by us or any Affiliate of ours with respect to GAO or its voting securities, would violate this paragraph 2.

This provision of the Standstill Agreement is, in effect, a reciprocity agreement, *i.e.*, Mesa is not required to refrain from acquisition if GAO commences similar acquisition activity against Mesa. The linchpin of Phillips' argument of ambiguity is the use of the term "affiliates." It argues that the reciprocity provision indicates that other parties, *i.e.*, affiliates of GAO or affiliates of Mesa, were deemed to be covered by the agreement. Phillips does not suggest who Mesa's affiliates might be, but it maintains that in view of its conceded "white knight" status the agreement obviously included it as GAO's affiliate. At least an ambiguity is created.

Although this is a slim reed upon which to set aside the parol evidence rule, it will suffice. The intent and object of the writing is thus subject to review in the light of the circumstances which surround the execution of the document so long as the document is not altered or changed. *Cleveland Trust Co. v. Wilmington Trust Co., supra.*

## VI

An analysis of the attendant circumstances is required. There is little doubt that the Standstill Agreement represented the culmination of the negotiations between Mesa and Phillips over who would acquire GAO. There is also no question that Phillips was to acquire GAO and, in the process, assure that Mesa received $15 million if, in the words of one of the investment bankers "it retired from the fray." When Douce and Pickens finalized the terms of Mesa's withdrawal they took a simplistic approach. Pickens wanted to be compensated and Douce wanted to make sure that Phillips acquired all GAO's property without further interference from Mesa. While Douce may have wanted a standstill agreement he wanted it to protect the valuable assets his company was about to acquire. Douce candidly admitted that the future of Phillips, as such, was never discussed, and the evidence fairly supports the assumption that Pickens, at that time, had no designs on Phillips.

The oral agreement reached between the respective CEOs required formalizing. Douce set the wheels in motion by advising Phillips' personnel of the terms of the deal and they, in turn, looked to Phillips' New York counsel, working with GAO's counsel, to structure the agreement. There was a great deal to be done in a short period of time in order to avoid the preliminary injunction hearing facing Mesa and GAO on January 7. In adopting a Standstill Agreement based on the Cities agreement, which contained the same "affiliates" provision and "interference with management" language, counsel for GAO and Phillips, in what is conceded to be "subtle fashion", inserted language which avoided "overtly mentioning" Phillips. There is no direct evidence that Mesa's counsel participated in this drafting but in any event the agreement when delivered for Pickens' signature contained language which Phillips' counsel hoped would provide Phillips with a Standstill Agreement without saying so, and more importantly, without alerting the oth-

er side that such was intended. So much for a meeting of the minds.

As previously noted, there is disagreement among the Mesa, Morgan Stanley and Skadden Arps entourage as to whether Pickens signed the agreement with the understanding that it provided Phillips with a five year standstill undertaking. The Morgan Stanley representatives who claim to have advised Pickens are now handsomely paid to act as financial advisors to Phillips in planning takeover defenses. The Skadden Arps firm labored under a similar disability of past representation. Although Joseph Fogg, who is not a lawyer, claims to have advised Pickens that the Standstill Agreement definitely included Phillips, no other lawyer in the room tendered a similar opinion. Indeed, Morgan Stanley's own counsel, Lovejoy, was of a different view. The most reasonable explanation, however, is that inclusion of Phillips in the agreement was simply a non-issue. It had not been mentioned by Douce and in view of its "coded" insertion in the agreement was not of direct concern to Pickens.

Apart from his claim that he was not then interested in going after Phillips, there is clear circumstantial evidence that such a move was not within Pickens' contemplation when he signed the GAO Standstill Agreement. As noted, both Skadden Arps and Morgan Stanley had longstanding and continuing takeover advisory relationships with Phillips. Indeed, Joseph Fogg claims to have advised Pickens during the GAO battle that if certain of Morgan Stanley's oil company clientele, including Phillips, became acquisition targets, Morgan Stanley's first loyalty would be to them. Flom described Morgan Stanley's and his firm's relationship and its significance to whether Pickens was being asked to negotiate a Standstill Agreement with Phillips through GAO:

> "Now, as a point of fact, not only did I, but Morgan Stanley, would not have represented Boone if we thought it was an active possibility of him going after Phillips."

Phillips argues that the differing versions of what transpired at Morgan Stanley when Pickens signed the agreement raise factual disputes—the resolution of which must await a final hearing and now preclude the grant of a preliminary injunction. The evidence which most strongly supports Phillips' argument is the testimony of Joseph Fogg and his Morgan Stanley associates. However, Fogg claims his reason for believing, as a non-lawyer, that the agreement might extend to Phillips was his reading of the "directly and indirectly" language in subpart 2(a). But, as noted, the ambiguity dispute centers on the "affiliates" provision not the "directly and indirectly" language. Thus even if Fogg's layman's view of the meaning of an agreement prepared by lawyers who wished to convey a hidden meaning in a subtle fashion was expressed, it did not extend to the principal, if not sole, substantial ambiguity in the agreement. If a preliminary injunction should issue because of irreparable harm the fact that evidence at this juncture does not dispel "the potential differences" which now exist and whose resolution must await a final hearing should not dictate otherwise if it is reasonably probable that the final hearing will yield the same result. *Gimbel v. Signal Companies, Inc., supra* at 617.

Phillips' effort to transform the Standstill Agreement into a document reflecting Phillips' present position based on its disguised past intention, in effect, results in a reformation of the agreement. In the absence of a mutually-shared understanding that Phillips was to be a beneficiary of paragraph 2, reformation would not be available. *Kaplan v. Centex Corporation*, Del. Ch., 284 A.2d 119 (1971).

This is not to say that no uncertainties remain as to the meaning of all language used in the agreement. The use of a five year period for restricting Mesa's activities toward GAO is somewhat puzzling in view of the frantic efforts of all concerned to finalize Phillips' acquisition within forty-eight hours. But as recent takeover histo-

ry attests, even finely crafted deals may become unraveled at the eleventh hour. *See, Pennzoil Co. v. Getty Oil Co., et al.,* Del.Ch., 473 A.2d 358 (1984). The most likely explanation for the five year term was that it was simply lifted from the Cities agreement and had the same significance then as it does now. It was intended to provide against the contingency, however remote, that the matter would become extended or that another white knight would appear on the scene. The same explanation, in all likelihood, applied to the affiliates provision.

■ In short, even if all attendant circumstances are considered, Phillips' claim that the Standstill Agreement contemplated its inclusion as a future acquisition target is unreasonable and beyond the scope of the discernable intention of the parties.

## VII

In addition to its argument that the Standstill Agreement might be interpreted to include it, Phillips contends that it succeeded to its benefits by operation of law upon the merger of GAO into Phillips. It relies upon the language of 8 *Del.C.* § 259 which confers upon the surviving corporation in a merger all "rights, privileges, powers, and franchises" of the constituent corporations. Mesa points out that had the parties intended that the agreement would extend to the "successors and assigns" of the designated parties such language could have been easily inserted. Indeed, such language was used in paragraph 3 as part of the mutual release of claims and litigation.

■ Phillips' argument has a surface appeal since under Delaware corporate law the survival of contractual obligations is recognized even in the absence of a "successors and assigns" clause. *Fitzsimmons v. Western Airlines, Inc.,* Del.Ch., 290 A.2d 682 (1972); *Western Airlines, Inc. v. Allegheny Airlines, Inc.,* Del.Ch., 313 A.2d 145, 153 (1973). Both *Fitzsimmons* and *Western Airlines* involved the survival of contractual obligations, not

powers. As the Court in *Western Airlines* noted, there is a strong public policy, designed primarily for the protection of creditors and third parties who dealt in good faith with the predecessor corporation, which supports this view. The Court further noted that, notwithstanding the Delaware merger statute, contractual obligations do not pass if the parties "by their objective contractual language contemplated that such obligations would not pass." *Id.* at 153.

Apart from the fact that the party now sought to be obligated under the survival theory is Mesa not Phillips, viewing Phillips as a successor beneficiary of the agreement does violence to the mutual intention of the parties. If the agreement was intended, as seems most plausible, to address only the right of GAO to require Mesa to desist in its acquisition efforts while Phillips proceeded with its plan of acquisition, that "power," possessed by GAO and presumably acquired by Phillips, had at the time of the merger accomplished its purpose. To the extent the "power" was exercised against Mesa, it had achieved full satisfaction. Phillips too achieved the benefit of that power upon the completion of the merger.

## VIII

■ Finally, I come to the balancing of hardships and the form of injunctive relief which is appropriate. Mesa argues that it needs not only a definition of its obligations, or lack thereof, under the Standstill Agreement but relief in the form of a preliminary injunction preventing Phillips from seeking a contrary judicial determination. Such relief should include, Mesa contends, the requirement that Phillips dismiss the Oklahoma action. Phillips maintains that Mesa's predicament is self-inflicted since it embarked on its tender offer with knowledge that an open question existed concerning the meaning of the Standstill Agreement. It further argues that to grant a preliminary injunction based on

what it views as an "advisory interpretation" of the agreement will unleash Mesa to attempt to seize control of Phillips. The result will be to put Phillips "into play" and limit its defensive efforts.

I do not share Phillips' view that the interpretation problem arising from the standstill agreement is of Mesa's doing. Mesa did not "knowingly structure" the Standstill Agreement through the use of subtle language as a hedge against the future. This situation is thus unlike that confronted by Judge Schwartz in *FMC Corp. v. R.P. Scherer Corp.*, D.Del., 545 F.Supp. 318 (1982), where injunctive relief was denied a hostile tender offeror who sought to enjoin a target's defensive efforts. Rather, given the reasonable likelihood that Mesa's view of the Standstill Agreement will prevail, injunctive relief to preclude Phillips from enjoining Mesa's acquisition efforts through the use of an agreement Phillips knowingly structured will have the salutary effect of removing the uncertainty which now exists in the financial markets.

There is no doubt that the now deferred but still viable Oklahoma lawsuit, and perhaps the Louisiana proceeding, constitute substantial obstacles to Mesa's right to attempt the acquisition of Phillips—a right which federal and state laws regulate but also recognize. In order to pursue that effort Mesa needs both a preliminary determination by way of declaratory judgment that the Standstill Agreement is no bar, as well as a restriction against Phillips, as the party espousing a contrary view, from attempting to litigate the issue elsewhere. By its showing that it is reasonably probable that its view of the Standstill Agreement will prevail at a final hearing it is entitled to such relief. That relief can be fully secured by extending as preliminary injunctive relief, the same temporary relief granted by Vice Chancellor Berger on December 6, 1984.

Mesa's request that, as part of the preliminary injunction, Phillips be directed not only to desist from pursuing its Oklahoma action but to voluntarily dismiss it as well is not justified. To begin with, despite the weight of the evidence which supports Mesa's view of the Standstill Agreement, there has been no final determination on that claim. Secondly, the Delaware Supreme Court has deferred Phillips' appeal from the December 6, temporary restraining order pending a ruling on the preliminary injunction. With the issuance of this decision that appeal, in which Phillips attacks the right of this Court to prevent it from litigating in Oklahoma, will now be activated. Should new life be breathed into the Oklahoma proceeding, Phillips should not be required to file a new action to present its claim.

It is unfortunate that there are forums competing to interpret the Standstill Agreement which the parties, both Delaware corporations, intended should be construed under the law of this jurisdiction. Phillips' concern is understandable. There are significant economic, sociological, and perhaps political, consequences which may flow from Mesa's pursuit of Phillips. But in a free marketplace those factors are beyond the power of the Courts, at least this Court, to control. Our duty is to attempt to resolve the controversy by the application of legal and equitable principles.

### IX

The press of time has not permitted mention of all contentions which Phillips' counsel has ably advanced. It is sufficient to note that its many arguments have been fully considered but do not change the result. An order reflecting the relief granted should be submitted. In the interim the restraining order currently in effect continues.

IT IS SO ORDERED.