In re PHILLIPS PETROLEUM
SECURITIES LITIGATION.
C.A. 85–14 HUDSON, et al.
v.
PHILLIPS PETROLEUM
COMPANY, et al.
C.A. 85–45 HUDSON, et al.
v.
PHILLIPS PETROLEUM
COMPANY, et al.
C.A. 85–281 IRWIN, et al.
v.
DOUCE, et al.
C.A. 85–401 KELLY, et al.
v.
PICKENS, et al.
C.A. 85–447 LAWRENCE, et al.
v.
PICKENS, et al.
C.A. 85–537 COHEN
v.
MESA PETROLEUM CO., et al.

Appeal of Florence HUDSON (Civil Action No. 85–14 MMS), Harry W. Voege; S. Paul Posner & Co., a partnership; Ominsky, Joseph & Welsh, P.C., Defined Benefit Plan U/A dated DDT July 1, 1976, Albert Ominsky, Trustee; Barnett Stepak; Initio, Inc.; Alfred D. Whitman; Connecticut Medical Laboratory, Inc.; Murray Bell; Pierre Haber and Leonard Brawer (Civil Action No. 85–45 MMS), Christopher P. Kelly and Brynn Kelly, Trustees for the Kelly Family Trust Under Trust Agreement dated as of October 1, 1977, on behalf of themselves and all others similarly situated (Civil Action No. 85–401 LON), John S. Lawrence, on behalf of himself and all others similarly situated (Civil Action No. 85–447), Jerry C. Cohen (Civil Action No. 85–537 MMS).

Appeal of John S. LAWRENCE.

Nos. 88–3719, 88–3755.

United States Court of Appeals,
Third Circuit.

Argued March 13, 1989.

Decided Aug. 9, 1989.

Rehearing and Rehearing In Banc
Denied Sept. 6, 1989.

Dianne M. Nast, Stuart H. Savett, Kohn, Savett, Klein & Graf, P.C., Philadelphia, for appellant Ominsky, Joseph & Welsh, P.C. Defined Benefit Plan U/A dated DDT 7/1/76, Albert Ominsky, trustee.

William Prickett (argued), Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Del., for appellants.

Stephen D. Oestreich, Wolf, Popper, Ross, Wolf & Jones, New York City, for all

appellants as lead counsel; individual counsel for appellant Harry Voege.

David J. Bershad, Milberg, Weiss, Bershad, Spechthrie & Lerach, New York City, for appellant Initio, Inc.

Irving Bizar, Bizar, D'Alessandro, Shustak and Martin, New York City, for appellant Florence Hudson.

David F. Dobbins (argued), Patterson, Belknap, Webb and Tyler, New York City, for appellant John S. Lawrence.

Charles F. Richards, Jr. (argued), Thomas A. Beck, William J. Wade, Richards, Layton & Finger, Wilmington, Del., for appellees Mesa Partners, Mesa Petroleum Co., Mesa Asset Co., T. Boone Pickens, Cyril Wagner, Jr., Jack E. Brown, I.T. Corley, Jack K. Larsen, J.R. Walsh, Jr., Robert L. Stilwell, Harley N. Hotchkiss, Wales H. Madden, Jr., David H. Batchelder, Jesse P. Johnson, Cy-7, Inc. and Jack-7, Inc.

Before MANSMANN, GREENBERG and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is an appeal from a grant of summary judgment against a consolidated plaintiffs class, comprised of individuals who purchased stock in the Phillips Petroleum Company ("Phillips") from December 5, 1984 through December 21, 1984. The named defendants in the class action include Phillips and the Phillips Board of Directors (the "Phillips defendants"), the Mesa Partnership ("the Partnership") which attempted to acquire control of Phillips by a hostile takeover in December 1984, and individual members of the Partnership, including Mesa Petroleum Company ("Mesa") and Mesa's Chief Executive Officer, T. Boone Pickens, Jr.[1] After a complex procedural history, the plaintiffs had outstanding claims alleging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1988); a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68 (1982 & Supp. III 1985); and claims arising under Delaware state law. After a settlement that removed the Phillips defendants from the litigation, plaintiffs moved for summary judgment on liability and the Mesa defendants cross-moved for summary judgment. The district court granted the Mesa defendants' motion, dismissing with prejudice all outstanding claims against them. *In re Phillips Petroleum Securities Litigation*, 697 F.Supp. 1344 (D.Del.1988).

While this appeal presents several issues, the principal matter confronting us is whether a genuine issue of material fact exists with regard to the securities fraud claims. If so, we must determine whether the record contains any evidence from which a jury could reasonably find scienter on the part of the Partnership, a necessary element of the plaintiffs' claims under the federal securities laws and RICO—and, thus, whether the district court erred as a matter of law in granting summary judgment on those claims. Because we believe there is sufficient evidence for a jury to so conclude, we will vacate the district court's judgment dismissing the claims under § 10(b) and Rule 10b-5, and remand for further proceedings on those claims. Additionally, as violations of the federal securities laws can constitute predicate acts under the RICO statute, we will vacate the district court's judgment and remand for further proceedings on the RICO claim.

---

**1.** Mesa Partners, from the takeover's launch until settlement with Phillips, was a General Partnership consisting of three general partners: Mesa Asset Company, which is an indirect wholly-owned subsidiary of Mesa Petroleum Company, CY-7, Inc. and Jack-7, Inc. The total group of defendants named in this action who were not officers of Phillips (the "Mesa defendants") is comprised of the following: Mesa Partners; Mesa Petroleum Company; Mesa Asset Company; Jack-7, Inc.; CY-7, Inc.; T. Boone Pickens, Jr., Chairman and CEO of Mesa Petroleum, and a director of Mesa Asset; Cyril Wagner, Jr., sole owner of CY-7, Inc. and a Mesa Petroleum director; Jack E. Brown, sole owner of Jack-7, Inc.; and the remaining members of the Mesa Petroleum Board of Directors, including I.T. Corley, Jack E. Larsen, J.R. Walsh, Jr., Robert L. Stillwell, Harley N. Hotchkiss, Wales H. Madden, Jr., David H. Batchelder, and Jesse P. Johnson.

We will, however, affirm the district court's dismissal of all claims brought under Delaware state law.

## I.

While this lawsuit concerns the Partnership's efforts to acquire control of Phillips, the germane facts begin with an earlier attempt by Mesa Petroleum to acquire Great American Oil Company of Texas ("GAO"). In December 1982, Mesa launched a hostile tender offer for GAO. In order to thwart Mesa's takeover, GAO negotiated a friendly "white knight" merger with Phillips. A key to consummation of the deal, however, was a settlement with Mesa in early January 1983. That settlement included Mesa selling its block of stock back to GAO, being compensated for its expenses and, most importantly, signing a Standstill Agreement whereby Mesa and its affiliates agreed in essence not to attempt to acquire any of the voting securities of GAO for a period of five years. The Standstill Agreement made no reference to any attempt by Mesa or its affiliates to acquire voting shares in Phillips.

The Partnership began to purchase Phillips common stock on October 22, 1984. On December 4, 1984, the Partnership issued a press release stating it had acquired approximately 5.7% of Phillips's outstanding shares and that it was commencing a tender offer for 15 million shares of Phillips common stock at $60 per share. The press release stated explicitly that the Partnership would "not sell any Phillips shares owned by it back to Phillips except on an equal basis with all other shareholders."

The Partnership filed its Schedule 13–D on December 5, 1984, as required under Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d)(1).[2] The Schedule 13–D stated that the proposed tender offer was designed ultimately to obtain control of Phillips. Furthermore, the Schedule 13–D reiterated the statement from the previous

day's press release that the Partnership did not intend to sell its shares to Phillips except on an equal basis with all shareholders.

The next day, December 6, 1984, T. Boone Pickens appeared on the nationally televised MacNeil/Lehrer News Hour representing the Partnership. In response to questioning by Mr. MacNeil, Pickens stated unequivocally that "[t]he only way we would consider selling back [to Phillips] is if they make the same offer to all shareholders."

Phillips responded to the Partnership's actions by attempting to block the takeover attempt in court. From the initial announcement of the takeover, both the Partnership and Phillips filed a succession of suits in an attempt to block or pre-empt the other's actions. In order of filing, these included the following: (1) an action by the Partnership in the United States District Court for the District of Delaware on December 4, 1984, to enjoin enforcement of the Delaware Tender Offer Act (8 Del.C. § 203) and to determine, under pendent jurisdiction, the applicability of the GAO Standstill Agreement to the Partnership's takeover of Phillips; (2) a declaratory action in Delaware Chancery Court to declare the GAO Standstill Agreement inapplicable to the Phillips takeover attempt; (3) the ex parte procurement of a temporary restraining order by Phillips in Oklahoma state court preventing the Partnership from moving against Phillips based upon the GAO Standstill Agreement; (4) further action by the Partnership in Delaware Chancery Court to restrain Phillips from pursuing its Oklahoma action; (5) further action by the Partnership in the Delaware Federal District Court to prevent Phillips from initiating action in any other federal court; and (6) an action by Phillips in Louisiana state court to prevent the Partnership from acquiring interest in certain Phillips assets in

**2.** Section 13(d)(1) of the Act provides that any person who acquires five percent of any class of any registered equity security must file with the Securities and Exchange Commission, within 10 days of such acquisition, a statement containing certain statutorily prescribed information, and

any additional information required by the Commission. The Commission promulgated Exchange Act Rule 13d–1, 17 C.F.R. § 240.13d–1, to implement that section by requiring the filing of a Schedule 13D. 17 C.F.R. § 240.13d–101.

Louisiana, through control of Phillips itself, without the prior approval of that state's regulatory agencies. The Louisiana action does not appear to have had any impact on the takeover contest and, indeed, no party to this lawsuit mentions it as having been a factor. The other actions all turned on the applicability of the GAO Standstill Agreement to the Partnership's attempt to take over Phillips. Both the United States District Court and the Oklahoma state court ultimately deferred to the Delaware Chancery Court for determination of the applicability issue.

At the same time the parties were jousting in court, however, Phillips was pursuing private negotiations with the Partnership. Settlement efforts were conducted by a neutral intermediary, Joseph Flom, Esq. On December 7, 1984, Phillips made its first offer, through Flom, to buy out the Partnership's interest in Phillips. Pickens, representing the Partnership, declined the offer—allegedly because it did not treat all shareholders equally. Phillips made repeated offers over the course of the next two weeks, all of which were refused, according to the defendants, because they did not treat all shareholders equally.

The turning point in the takeover fight came on December 20, 1984. On that day, the Delaware Chancery Court ruled that the GAO Standstill Agreement did not apply and, thus, did not bar a takeover of *Phillips* by the Partnership. *Mesa Partners v. Phillips Petroleum Co.,* 488 A.2d 107 (Del.Ch.1984).

With the issuance of the December 20 opinion, Phillips found itself without a viable litigation defense. Thus, after a meeting with advisers, officials at Phillips decided they had to negotiate with the Partnership. Sometime in the early to midafternoon of December 21, Flom contacted Pickens to arrange a meeting for 5:30 p.m. EDT. The significance of the meeting time lay not just in the time of day, occurring after the stock market would have closed, but also in that December 21, 1984 fell on a Friday. Thus, the parties had an entire weekend to forge an agreement without having to make disclosures for the benefit of the market. From the inception of the tender offer through December 21, the Partnership had made no less than eight amendments to its Schedule 13-D; indeed, the Partnership made the eighth amendment on the afternoon of December 21. In none of those amendments had the Partnership changed its original statement that it would not sell any of its shares back to Phillips except on an equal basis with all other shareholders.

On the face of the record, it would appear that the Partnership should have had every reason to believe that the December 21 meeting would be to negotiate the terms for Phillips's concession to its offer. Instead, claim the defendants, Phillips presented the Partnership with its plans for a defensive recapitalization which all the defendants allege would have effectively blocked the takeover. Reduced to the barest terms, under the recapitalization plan Phillips proposed to exchange 29% of its common stock for debt securities valued at $60 per share (pro rata among all shareholders), and to sell 27.5 million newly issued shares to a new employee stock ownership plan at a market price assumed to be $50 per share while purchasing 27.5 million shares of its stock back in open market transactions. Additionally, the recapitalization included reductions in expenses and capital expenditures, as well as the sale of approximately $2 billion of Phillips's lower-earning assets.

The parties negotiated vigorously through the weekend, proposing and counter-proposing various plans. The specifics of these proposals are not germane to our decision, but two facts are worth noting. First, Phillips insisted that under no circumstances could the Partnership continue as a shareholder of Phillips. Thus, with the exception of the Partnership on Friday night proposing a leveraged buy-out of Phillips, all negotiations for the remainder of the weekend dealt with the Partnership selling its stock back to Phillips as part of the recapitalization. Second, the Partnership maintains it turned down several proposals in the course of the weekend be-

cause they did not treat all shareholders on an equal basis.

Nonetheless, on December 23, 1984, Phillips and the Partnership reached an agreement in which all shareholders were not treated on an equal basis. The final agreement provided, first, that Phillips would reclassify 38% of its common stock (pro rata for all shareholders) into preferred stock, which was then to be exchanged for debt in the principal amount of $60 per share. Second, Phillips would create an employee incentive stock ownership plan (an "EISOP"), to which it would sell no more than 32 million newly issued shares at market value. Finally, Phillips was required to purchase at least $1 billion of its common stock on the open market following the exchange. Investment bankers for Phillips placed the value of the blended package—debt securities plus Phillips stock—at $53 for shareholders.

The Partnership, however, received a different arrangement. If the recapitalization were approved by the shareholders, it would sell its shares back to Phillips for $53 per share in cash. In the event the shareholders did not approve the recapitalization, the Partnership was given several options: it was given a put whereby it could still sell its shares to Phillips for the same $53 cash per share; it could retain its Phillips shares, subject to a standstill agreement; or it could sell its Phillips shares to a third party. Additionally, Phillips agreed to pay the Partnership's certified expenses in waging the takeover battle, an amount of $25 million. Other shareholders were not compensated for their expenses.

The agreement was announced in a press release, issued on Sunday night, December 23. The following day, Monday, December 24, the Partnership amended its Schedule 13–D yet again, this time to say that the Partnership had agreed not to pursue its attempt to gain control of Phillips and that the Partnership would eventually dispose of its shares; the amendment, however, made no revision in the equal basis statement. The market reacted adversely to announcement of the agreement and, on that same Monday, the price of Phillips stock fell by more than nine points, closing at approximately $45 per share. The value of the blended package available to Phillips shareholders, other than the Partnership, declined accordingly.

On March 3, 1985, the Phillips shareholders rejected the recapitalization plan. On March 6, the Partnership exercised its put under the December 23 agreement and sold its shares back to Phillips for $53 cash per share.[3]

Subsequently, Phillips made another Exchange Offer to its shareholders, offering another blended package Phillips valued at slightly in excess of $52 per share. At no time were all Phillips shareholders offered the same $53 cash per share received by the Partnership.

II.

The present case began with the filing of two stockholder derivative and class action suits, which were consolidated under the caption, *Hudson v. Phillips Petroleum Co.,* C.A. No. 85–14/85–45. Dkt. 12, C.A. No. 85–014.[4] The order provided that any subsequently transferred actions which related to the subject matter of the consolidated action would also be consolidated without further order of the court.

Three more stockholder class actions, naming all of the Phillips and Mesa defendants,[5] plus a fourth naming just the Phil-

---

**3.** On March 5, defendants CY–7, Inc. and Jack–7, Inc. had assigned their interests in the Partnership to Mesa Southern Company, a wholly-owned subsidiary of Mesa Petroleum Company.

**4.** The two actions consolidated were *Florence Hudson, et al. v. Phillips Petroleum Co., et al.,* C.A. No. 85–14 MMS and *Harry Voege, et al. v.*

*Phillips Petroleum Co., et al.,* C.A. No. 85–45 MMS.

**5.** *Kelly v. Pickens, et al.,* C.A. No. 85–401, was transferred from the Central District of California, *Lawrence v. Pickens, et al.,* C.A. No. 85–447, was transferred from the Southern District of New York; *Cohen v. Mesa Petroleum Co., et al.,*

lips defendants,[6] were consequently transferred to the District of Delaware. All were consolidated for pretrial purposes on August 8, 1985 under the caption *In re Phillips Securities Litigation,* Master File No. Misc. 85–75. Order No. 1 (Case Management Order), Dkt. 1.

In March 1986, the district court preliminarily approved a settlement between the Phillips defendants and a class of all record or beneficial holders of Phillips stock as of December 4, 1984, and their successors in interest and transferees, through the close of business on March 29, 1985.[7] Following notice and a hearing, the district court entered an Order and Final Judgment on June 3, 1986, dismissing with prejudice Counts IV, V, VI, VIII, IX, X and X of the Class Action and Verified Derivative Supplemental Amended Complaint (the "Complaint") and such parts of Count VII of the Complaint which would have required proof of wrongful conduct or participation by the Phillips defendants.

On May 18, 1987, the district court entered a consent order which (i) consolidated for all purposes, including trial, the five actions that named all the Phillips and Mesa defendants;[8] (ii) dismissed with prejudice all claims other than those asserted as Counts I, II, II and VII of the Complaint; (iii) certified a class consisting of purchasers of Phillips stock during the period from December 5, 1984 through December 21, 1984; (iv) dismissed with prejudice all plaintiffs who were not members of the certified class; (v) appointed class representatives; (vi) provided a schedule and method for notification to class members. On October 13, 1988, the district court granted the Mesa defendants' motion for summary judgment and denied the plain-tiffs' motion for partial summary judgment.

Count I of the Complaint alleged violations of Section 10(b) and Rule 10b–5. The district court ruled that the plaintiffs had not introduced any evidence of scienter, a necessary element of a cause of action under Section 10(b) or Rule 10b–5. Count II alleged a cause of action under the doctrine of promissory estoppel; Count III alleged that an implied contract was formed by the equal basis statements. The district court ruled that the plaintiffs failed to adduce sufficient evidence to support either of these theories. The plaintiffs, on appeal, also claim that Count III fairly includes a claim under a theory of quasi contract. The district court dismissed this claim on summary judgment as well, ruling that a quasi contract claim was not preserved under the May 18, 1987 consent order and that, in any event, no evidence of quasi contract had been adduced. Finally, the district court dismissed Count VII, which alleged violations of the Racketeer Influenced and Corrupt Organizations Act, because in failing to produce evidence of scienter—and, thus, evidence of violations under Section 10(b) and Rule 10b–5—the plaintiffs could not point to securities fraud as constituting the predicate acts necessary to invoke the RICO statute. Similarly, ruled the district court, the plaintiffs failed to adduce any evidence of intent to defraud and, consequently, could not prove mail fraud, under 18 U.S.C. § 1341 (1982 & Supp. III 1985), or wire fraud, under 18 U.S.C. § 1343 (1982 & Supp. III 1985), as predicate acts either. The plaintiffs appeal all of these rulings by the district court.[9]

### III.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-

C.A. No. 85–537, was transferred from the Northern District of Texas.

**6.** *Irwin v. Phillips Petroleum Co., et al.,* C.A. No. 85–281.

**7.** Except for attorneys' fees and expenses, the Phillips defendants under the settlement will pay a sum to the class only in the event the plaintiffs ultimately recover against the Mesa defendants.

**8.** Nos. 85–014, 85–045, 85–401, 85–447, and 85–537.

**9.** Plaintiff class member Lawrence filed a separate notice of appeal on oovember 10, 1988, from the judgment of the district court. *In re Phillips Petroleum Securities Litigation,* No. 88–3755.

ment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Consequently, a plaintiff may not simply rest upon his bare allegations to require submitting the issue to a jury; rather, he must present "significant probative evidence tending to support the complaint." *Id.* at 249, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). If the movant can, to the trial court's satisfaction, demonstrate such a failure, the burden then shifts to the non-movant to identify which portions of the record support the allegedly unsupported element. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Jersey Central Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986).

Summary judgment should only be granted, however, where there are no genuine issues of material fact that can only be properly resolved by a trier of fact because they may reasonably be resolved in favor of either party. As the Supreme Court has stated:

[T]his standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.... If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–51, 106 S.Ct. at 2511 (citations omitted).

On review of a grant of summary judgment, we apply the same test the district court should have utilized initially. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We turn to the principal issues in this case, therefore, to decide whether there exists a genuine issue of material fact and, if so, whether a jury could reasonably find scienter from the facts contained in the record.

## IV.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), forbids "manipulative" or "deceptive" conduct "in connection with the purchase or sale of any security." *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977). Rule 10b–5, promulgated under § 10(b), prohibits the making of "any untrue statement of material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5.[10]

---

**10.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

In order to establish a claim under § 10(b) and Rule 10b–5, a plaintiff must prove that the defendant i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's injury. *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 942–43 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *accord Huddleston v. Herman & Maclean,* 640 F.2d 534, 543 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The misrepresentations must touch upon the reasons for the investment's decline in value. *Huddleston,* 640 F.2d at 549.[11]

Scienter is defined as " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Dirks v. SEC,* 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). A violation of Rule 10b–5 "may be found only where there is 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.' " *Id.* (quoting *Hochfelder,* 425 U.S. at 199, 96 S.Ct. at 1384).

Scienter must be proven by showing the defendant lacked "a genuine belief that the information disclosed was accurate and complete in all material respects." *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979). Moreover, as we stated in *McLean,* "[c]ircumstantial evidence may often

be the principal, if not the only, means of proving bad faith." *Id.* We have also recognized that recklessness on the part of a defendant meets the scienter requirement of Section 10(b) and Rule 10b–5. *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649 (3d Cir.1980). Recklessness, in turn, is defined as

> 'an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it.'

*Id.* (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)). *See also SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir.1968) (en banc) ("Rule 10b–5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public ... if such assertions are false or misleading or are so incomplete as to mislead...."), *cert. denied sub nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

The district court ruled that nothing in the summary judgment record indicated the equal basis statements were considered untrue when made by the Partnership. Rather, the Partnership changed its intent to sell its shares back to Phillips only when faced with the defensive recapitalization.[12] Consequently, said the district court, because statements in a Schedule 13–D need only be true when made, the plaintiffs failed to produce any evidence of scienter by the Partnership.

---

**11.** The district court ruled that the plaintiffs had adduced sufficient evidence to satisfy the "in connection with" requirement and that finding is not questioned on this appeal.

**12.** The district court also ruled that the package offered the other Phillips shareholders—a combination of debt securities and Phillips stock—did not confer the same economic benefit as the $53 cash received by the Partnership. The defendants briefly contest this finding in their brief. We think it apparent that the packages were not of equal value. As the district court correctly found, the shareholders bore the market risk inherent in the debt securities and the risk in the decrease in value of Phillips stock.

The sharp decline in the price of Phillips stock could be expected in the wake of any settlement of a takeover fight. Additionally, two of the principals of the Partnership, T. Boone Pickens, Jr. and Cyril Wagner, Jr. both admitted in depositions that they were aware that a real possibility existed the price of oil would decline soon thereafter and, consequently, would adversely affect the price of Phillips stock. Given these facts, it is difficult to credit the defendants' statements that they believed all shareholders were being offered equal value—no matter what the investment bankers were saying on the night of December 23.

■ We believe the district court was correct that a statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b–5.[13] Similarly, we think it self-evident that a change from a party's initial statement of intent does not by itself prove that the initial statement was a misrepresentation. *See, e.g., Bourdages v. Metals Refining Ltd.,* [1984–85 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 91,828 at 90,168 (S.D.N.Y. 1984) ("Subsequent misleading statements or other conduct may be admissible as grounds for a reasonable inference of fraudulent intent at the time the transactions were entered into; but they are not and cannot be actionable in themselves."). Changed circumstances naturally can require a change in plans. *See, e.g., Brascan, Ltd. v. Edper Equities, Ltd.,* 477 F.Supp. 773, 787–88 (S.D.N.Y.1979) (no scienter existed under Rule 10b–5 where investor made a good faith representation of its intent to no longer purchase stock on one day, and then changed its intent and commenced those same purchases the next day). Thus, we believe that in these circumstances all one can fairly require is that notice of a change of intent be disseminated in a timely fashion. At least one commentator has reached the same conclusion:

An express statement of intent must be correct when made and an implied intent must be true when it is implied. The Rule [10b–5] would not generally be violated merely because the representer subsequently changed his mind; accordingly, a mere breach of contract is not actionable. But he should be liable for failing to convey his change of heart to a plaintiff who thereafter made an investment decision and whom the defendant knew, or was reckless in not knowing, was relying on his intent. A defendant also violates the Rule if he defers or delays a planned course of action in order to cover up his misrepresented or concealed intent.

5A A. Jacobs, *Litigation and Practice Under Rule 10b–5,* § 61.01[c][iii] at 3–68 to 3–70 (2d ed.1988) (footnotes omitted).

■ Plaintiffs contend that, if the Partnership did change its intention only to sell its stock back to Phillips on a basis equal to all other stockholders—as opposed to the Partnership having always intended to sell back on an unequal basis—then they are liable under the federal securities laws nonetheless for failing to communicate that change of intention promptly. There can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised. *See, e.g., Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 583–84 (3rd Cir. 1975) (statements about corporation's dire financial condition, while true when made, formed basis for liability when corporation's condition improved but speaker did not correct impression of near-insolvency before purchasing stock); *see also* Exchange Act Rule 13d–2, 17 C.F.R. § 240.13d–1 (requiring where "any material change occurs in the facts set forth" in a Schedule 13D, that the person required to file the Schedule 13D "promptly" file "an amendment disclosing such change" with the Securities and Exchange Commission, the issuer of the security, and with any exchange on which the security is traded).

■ The law has been less clear on what constitutes sufficiently prompt revision and dissemination of a statement of intent. With regard to amendment of a

---

**13.** *See Zaro v. Mason,* 658 F.Supp. 222, 227 (S.D.N.Y.1987) ("A promise, or a statement of intentions, is actionable under § 10(b) only if, at the time the statement was made, the declarant secretly intended not to perform, and if the promise was part of the consideration for a sale of securities"); *cf. Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) ("[m]aking a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) ..."); *Stratton Group Ltd. v. Spray-* *regen,* [1978 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 96,302 at 93,016–17 (S.D.N.Y.1978) (false statement of future intention actionable) (citing *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967)). While these cases all deal with situations where the promise was part of the consideration for the sale of the securities, we believe the same reasoning applies to any promise of future intent made "in connection with" the purchase or sale of securities.

Schedule 13D, at least, the Securities and Exchange Commission itself has noted as much:

No bright line test has been adopted in order to determine when an amendment to a Schedule 13D is "prompt."... Strong policy considerations indicate that the "prompt" amendment requirement should be construed flexibly in order to comport with the circumstances of the particular case.

*In the Matter of Cooper Laboratories, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 83,788 at 87,-526 (June 26, 1985). We believe, as other courts have recognized, that the question of whether an amendment is sufficiently prompt must be determined in each case based upon the particular facts and circumstances surrounding both prior disclosures by the acquirer and the material changes which trigger the obligation to amend. *See, e.g., Kamerman v. Steinberg,* 123 F.R.D. 66, 74 (S.D.N.Y.1988) ("The determination that an amendment is 'prompt' under Rule 13d-2 is a question of fact to be determined from the attendant circumstances of each individual case."); *Scott v. Multi–Amp Corporation,* 386 F.Supp. 44, 61 (D.N.J.1974) (treating as question of fact whether required filing was sufficiently "prompt" under Rule 13d-2); *SEC v. GSC Enterprises,* 469 F.Supp. 907, 914 (N.D.Ill.1979) (whether filing of amendment to Schedule 13D under Rule 13d-2 was "prompt" a question of fact). Moreover, the same type of individual fact determination must be made with regard to amending other statements made outside a Schedule 13D, but still "in connection with" the purchase or sale of a security. An example of such a statement, in the case before us, would be Pickens's comments during the MacNeil/Lehrer News Hour.

■ On the record before us, however, the Partnership's delay in disseminating its change of intent could not have proximate-ly caused the plaintiffs' injury. The plaintiff class is defined as purchasers of Phillips stock during the period from December 5, 1984 through December 21, 1984. Assuming that the equal basis statements were a true representation of the Partnership's intent when they were made, plaintiffs provide no evidence of a change of intent until after the stock market closed on Friday, December 21.[14] But inasmuch as plaintiffs could not have sold their stock on the open market until it opened on Monday morning, December 24, the difference between announcing a change of intent Sunday night rather than Friday night would not have detrimentally altered plaintiffs' opportunities. Consequently, on this record a jury could not reasonably conclude that the Partnership was dilatory in announcing its change of intent. Because the plaintiff class does not include purchasers after December 21, 1984, assuming that the Partnership did change its intent over the weekend, it is difficult to understand how a delay in the announcement could have injured plaintiffs as they had already purchased the Phillips shares.

■ We arrive at a different conclusion with respect to a jury finding of recklessness by the Partnership. As we have noted, recklessness meets the scienter requirement of Section 10(b) and Rule 10b–5. Few markets shift as quickly and dramatically as the securities markets, especially where a publicly traded company has been "put in play" by a hostile suitor. The equal basis statements were broad and unequivocal, providing no contingency for changing circumstances. Even though they needed only be true when made, such unequivocal statements presented an obvious danger of misleading the public—because they can fairly be read as a statement by the Partnership that, no matter what happened, it would not change its intentions. Indeed,

**14.** Plaintiffs contend that, because Pickens arranged the May 21 meeting with Flom before the market closed on Friday afternoon, the Partnership should have amended its Schedule 13–D that same afternoon to reflect the change of intent. Plaintiffs provide no evidence, though, that a change of intent was contemplated by Pickens or the Partnership in agreeing to the meeting. Indeed, given the ongoing negotiations between the parties and given the decision by the Delaware Chancery Court the preceding afternoon, agreeing to a meeting was just as consistent with the statement of intent in the Partnership's original Schedule 13–D as with the ultimate result.

the repetition of the equal basis statements as the takeover fight progressed would only serve to reinforce such a perception. A jury could, therefore, reasonably find making the statements to be an extreme departure from the standards of ordinary care. *See Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d at 649.

Plaintiffs go even further, contending in the alternative that the Partnership did not change its intent in response to the defensive tactics of Phillips when it negotiated the buy-back agreement, but rather had no intention from the outset to honor the equal treatment statement. The record contains evidence to support this allegation as well. As we have noted, the decision by the Delaware Chancery Court on December 20, 1984, that the GAO Standstill Agreement was inapplicable left Phillips with no viable litigation defenses. The Partnership was free to pursue its tender offer and to buy Phillips stock in open market transactions.[15] Both the district court's decision and the defendant's arguments, consequently, turn on the assumption that the defensive recapitalization proposed by Phillips on the night of December 21 was sufficiently impregnable on its face to cause the Partnership, after all of its efforts, to suddenly abandon its takeover fight.

While the record contains insufficient information about the recapitalization plan for a full understanding of all of the plan's subtleties, it contains more than enough details for a jury reasonably to conclude that it had only a chance for success or that the Partnership would not have been deterred by it. First, the plan required huge amounts of capital, at least $2 billion from the sale of Phillips assets and, perhaps, additional financing from lending institutions. A significant question of fact exists as to whether either of these sources could produce the necessary capital in time to stave off a hostile takeover by the Partnership. The Partnership, in contrast, having already launched its tender offer, presumptively had financing in place. Second, because the recapitalization involved the exchange of debt securities for equity in the company pro rata among shareholders, the recapitalization as proposed to the Partnership on the night of December 21 "contemplate[d]" approval by the shareholders. Yet when an opportunity finally did occur more than two months later to present to the shareholders a recapitalization involving the same debt for equity exchange, the shareholders rejected the plan. Again, a significant issue of fact exists as to whether the Partnership actually believed the recapitalization could be implemented in time. Finally, and most notably, the success of the Phillips defensive recapitalization plan depended upon its ability to buy up 27.5 million shares of its own stock in the face of a competing tender offer by the Partnership. In sum, given all of these contingencies, the record contains sufficient circumstantial evidence from which a jury could reasonably conclude that the proposed recapitalization was an insufficient basis to cause the Partnership to change its intent—but, rather, that the recapitalization was merely a reason given by the Partnership for following a course different from its stated intention.

Even if the defensive recapitalization did have a high probability of success, however, sufficient evidence exists in the record from which a jury could reasonably conclude the Partnership always intended to sell its shares back to Phillips on a different basis from that offered to other shareholders. When the tender offer was launched, it was foreseeable to the Partnership that it might at some point want to

---

**15.** The Partnership argues that the Oklahoma state court continued to restrain it from pursuing its tender offer. The appellants provide neither explanation nor documentation in support of this contention. The December 20 Delaware Chancery Court opinion, however, indicates that the Oklahoma state court had deferred to the Delaware court's jurisdiction over the matter. *Mesa Partners v. Phillips Petroleum Company,* 488 A.2d 107, 109 (Del.Ch.1984).

Even if the Oklahoma court did continue to restrain the tender offer, armed with the Delaware court's decision—construing a contract between two Delaware corporations—and given the resources the Partnership had already brought to bear in its attempt to take over Phillips, a jury could reasonably conclude that the Partnership did not consider the Oklahoma court's actions to be a major hurdle in any event.

give up its takeover attempt and abandon its stake in Phillips. Indeed, it is exactly that contingency which the equal basis statements contemplate. It seems an unlikely possibility that the Partnership envisioned the board of Phillips Petroleum taking the corporation private, which would be the natural effect of a cash offer for all outstanding shares. The facts that some cash was not made available to other Phillips shareholders as part of the blended package, and that Phillips had to sell $2 billion of its assets to raise cash for the recapitalization, could provide the basis for a fair inference by a jury that a cash offer for all outstanding shares was not possible—and that, moreover, given the sophisticated valuation of Phillips that the Partnership would have had at its disposal, the Partnership would know such a global cash offer could not be made. Consequently, one could read the equal basis statements to imply that something other than cash would be given as at least part of the consideration in any buy-back arrangement.

Moreover, a reasonable jury could find the defendants' explanations as to why the Partnership did not take the same mixed package that was offered to the remainder of the shareholders to be insufficient to rebut the fair inferences that can be drawn from this record. Equal treatment for all shareholders was available, either by the Partnership accepting the same package of stock and debt securities ultimately offered to the other shareholders, or by the cash that was paid to the Partnership instead being offered pro rata to all shareholders instead of the debt securities. That the Phillips board would not allow the Partnership to maintain an interest in the company hardly strikes us as compelling. Nothing kept the Partnership simply from holding its stock in Phillips. Moreover, that the Partnership refused to take the same mixed package offered to the other shareholders—thereby both reducing the Part-

nership's position in the corporation to assuage the fears of the Phillips board, while simultaneously sharing the available cash pro rata with all of the Phillips shareholders—belies the defendants' contention that they believed all of the shareholders were getting equal value.

While a great deal of what the record contains amounts to no more than circumstantial evidence, we have previously observed that "[c]ircumstantial evidence may often be the principal, if not the only, means of proving bad faith." *McLean v. Alexander*, 599 F.2d at 1198. Given the contradiction between the Partnership's vigorous equal basis statements, plus the circumstances we have outlined, a jury could reasonably conclude that the Partnership either was reckless in making the equal basis statements given the foreseeability of what actually occurred, or that the Partnership intended from the outset of its tender offer to sell back to Phillips on an unequal basis. Consequently, the district court's entry of summary judgment on the security fraud claim for failure to adduce evidence of scienter was incorrect and we will vacate it.[16]

## V. THE RICO CLAIM

■ The plaintiffs alleged in Count VII of their Complaint that the Partnership violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982 & Supp. III 1985). Specifically, they allege "multiple acts of securities, mail and wire fraud by filing, mailing, transmitting and publishing the December 4, 1984 press release and the Schedule 13D and amendments thereto" constitute a pattern of racketeering activity under the statute. Additionally, they claim predicate acts of fraud by the Partnership in its failure to disclose that it "intended to enter and had entered into negotiations with Phillips with a view to selling its Phil-

---

**16.** Based on its finding that the plaintiffs had failed to adduce any evidence of scienter, however, the district court declined to address whether the plaintiffs adduced sufficient evidence of the remaining elements of their claim under Section 10(b) and Rule 10b–5: misrepre-

sentation of, or failure to disclose, material facts; duty to disclose; and causation. Consequently, the parties have not provided extensive briefing on these points and we will not consider them. On remand, the parties are free to renew their motions with regard to these points.

lips shares to Phillips at a premium price not available to other stockholders."

The district court granted summary judgment to the defendants on Count VII based on its finding that plaintiffs had failed to adduce any evidence of scienter. Thus, reasoned the district court, plaintiffs could not establish predicate acts of securities fraud and, similarly, could not establish the intent necessary to support a finding of either mail fraud, under 18 U.S.C. § 1341 (1982 & Supp. III 1985), or wire fraud, under 18 U.S.C. § 1343 (1982 & Supp. III 1985).

We have already concluded that plaintiffs have adduced sufficient evidence from which a jury may reasonably find scienter for purposes of federal securities fraud. Consequently, they may be able to establish a prima facie case for the predicate acts necessary to sustain a claim under RICO. *See, e.g., Kronfeld v. First Jersey National Bank,* 638 F.Supp. 1454, 1471 (D.N.J.1986) (securities fraud constitutes predicate acts under RICO); *In re Catanella and E.F. Hutton & Co., Inc. Securities Litigation,* 583 F.Supp. 1388, 1425 (E.D.Pa.1984) (same); *cf. Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 18–19 (2d Cir. 1983) (while securities fraud may ordinarily serve as predicate act under RICO, plaintiff unlikely to prove predicate acts at trial).

Similarly, because mail fraud can be premised upon a reckless disregard for the truth of the facts, as well as a specific intent to defraud, the plaintiffs have adduced sufficient evidence to proceed to trial on proof of mail fraud. *United States v. Boyer,* 694 F.2d 58, 59–60 (3d Cir.1982) (specific intent to deceive, as element of mail fraud and securities fraud, could be found from material misstatement of fact made with reckless disregard of the facts); *United States v. Schaflander,* 719 F.2d 1024, 1027 (9th Cir.1983) (reckless disregard for truth or falsity is sufficient to sustain a mail fraud conviction), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2660, 81 L.Ed.2d 366 (1984); *United States v. Frick,*

588 F.2d 531, 536–37 (5th Cir.) (reckless indifference for truth can be fraudulent under mail fraud statute), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979).

Finally, as the same elements provide the basis for both mail fraud and wire fraud, plaintiffs have adduced sufficient evidence of intent for their claim of wire fraud to survive summary judgment. *United States v. Lemire,* 720 F.2d 1327, 1334 n. 6 (D.C.Cir.1983) (as requisite elements of "scheme to defraud" under wire fraud statute and mail fraud statute are identical, cases construing mail fraud apply to wire fraud statute as well), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *see also United States v. Sawyer,* 799 F.2d 1494, 1501–02 (11th Cir.1986) (fraudulent conduct that will establish "scheme to defraud" within purview of wire and mail fraud statutes includes knowingly making false representations, or concealing material facts that include statements made with reckless indifference as to their truth or falsity), *cert. denied sub. nom., Leavitt v. United States,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987).

## VI.

The district court correctly analyzed the plaintiffs' state law claims and we will affirm its judgment on all of these.

■■■ In light of our finding that plaintiffs have adduced sufficient evidence of scienter to survive summary judgment, however, we make one observation in addition to the district court's thorough analysis. In order to satisfy the causation element of an action under § 10(b) or Rule 10b–5, plaintiffs who purchase in an open and developed market need not prove direct reliance on a defendant's misrepresentation; rather, they can satisfy their burden of proof simply by showing that the defendant made a material misrepresentation. *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988) (plurality opinion); *Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986).[17] Thus, as

17. As we noted in *Peil,* this "fraud on the market" theory rests upon the assumption that there

is a nearly perfect market in information, and that the market price of stock reacts to and

the plaintiff class is defined as those who purchased Phillips stock after the equal basis statements were first made, and as no determination has as yet been made on the "material misrepresentation" element, the plaintiffs' claim under § 10(b) and Rule 10b–5 survives the summary judgment motion.

 The "fraud on the market theory," though, has no analogue in the doctrine of promissory estoppel. To recover under an estoppel theory, the plaintiffs must come forward with evidence not only that the Partnership intended to induce reliance, but also that they reasonably relied upon the equal basis statements in purchasing their stock. *Rabkin v. Philip A. Hunt Chem. Corp.*, 480 A.2d 655, 661 (Del.Ch.1984), *rev'd on other grounds*, 498 A.2d 1099 (Del.1985); *see also* Restatement (Second) of Contracts § 90 comment b (1981) (requiring that promisee's reliance be reasonable). The plaintiffs have produced no probative evidence of reliance on the equal basis statements.[18] Moreover, even if they had, reliance upon a mere expression of future intention cannot be "reasonable," because such expressions do not constitute a sufficiently definite promise. *Santoni v. Federal Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir.1982); *accord Derry Finance N.V. v. Christiana Companies, Inc.*, 616 F.Supp. 544, 550 (D.Del.1985) (" '[A] truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built. The intention is subject to change.' ") (quoting *Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 130 N.E. 295, 298 (1921)), *aff'd*, 797 F.2d 1210 (3d Cir.1986). *See also Reeder v. Sanford School*, 397 A.2d 139, 141 (Del.Super.1979) ("expressions of opinion, expectation, or assumption are insufficient" to produce an estoppel). Consequently, even though the plaintiffs have adduced sufficient evidence of intent to survive summary judgment on their federal claims, their promissory estoppel claim must fail on the reasonable reliance element.

### CONCLUSION

For the reasons discussed above, the portion of the district court's judgment dismissing the claim under Section 10(b) and Rule 10b–5, and the claim under RICO, will be vacated for further proceedings consistent with this opinion. The remainder of the district court's judgment will be affirmed. Each side to bear its own costs.

---

reflects the available information. 806 F.2d at 1161 n. 10. Thus, while the theory is plausible in developed markets, we questioned its applicability to newly issued securities. *Id.* Here, as in *Peil*, though, we deal with a stock well-established in the market and widely traded and, consequently, we need not determine in this case the precise boundaries of the theory's application.

**18.** The only evidence of reliance in the record to which plaintiffs can point is that, subsequent to the Partnership filing its first Schedule 13–D, trading in Phillips stock increased from 1,637,900 shares on December 4, to 7,606,700 on December 5. This is as easily attributable to the simple fact that a takeover fight for Phillips was beginning—along with a consequent bidding war for Phillips stock—as to specific reliance by individual shareholders on the equal basis statements. Thus, by itself, it does not satisfy the requirement of specific reliance necessary to support a claim under promissory estoppel.